**W. Terrell BAITY, Plaintiff,**

v.

**James F. KRALIK and County
of Rockland, Defendants.**

Case No. 12–CV–510 (KMK).

United States District Court,
S.D. New York.

Signed Sept. 30, 2014.

Michael H. Sussman, Esq., Sussman & Wakins, Goshen, NY, for Plaintiff.

Eric Dranoff, Esq., Robert B. Weissman, Esq., Saretsky Katz Dranoff & Glass, L.L.P., New York, NY, for Defendants.

## ORDER

KENNETH M. KARAS, District Judge:

Plaintiff W. Terrell Baity ("Baity"), by his counsel, Michael H. Sussman, brings this Action against Defendants James Kralik ("Kralik") and the County of Rockland ("Rockland County" or "the County"), alleging that Defendants discriminated against him on the basis of his race by terminating him from his position as a probationary corrections officer with the Rockland County Department of Corrections. Before the Court is Defendants' Motion for Summary Judgment. (*See* Dkt. No. 26.) For the following reasons, Defendants Motion is Granted.

## I. BACKGROUND

### A. Plaintiff's Rule 56.1 Statement

"Local Civil Rule 56.1 calls for a summary judgment movant to submit 'a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried,' and for the opposing party to submit 'a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.'" *Johnson v. IAC/Interactive Corp.*, 2 F.Supp.3d 504, 507 (S.D.N.Y.2014) (quoting Local R. 56.1(a)-(b).) In responding to

a Rule 56.1 statement, the party opposing the motion for summary judgment is "required by [the district's] Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record." *Risco v. McHugh*, 868 F.Supp.2d 75, 86 n. 2 (S.D.N.Y.2012) (citing Local Rule 56.1(b), (d), and Fed.R.Civ.P. 56(c)). "If the opposing party then fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Johnson*, 2 F.Supp.3d at 507; *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003). The purpose of this rule, and counsel's compliance with the same, is to assist the Court by narrowing the scope of the issues to be adjudicated and identifying the facts relevant and admissible to that determination. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir.2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").

Plaintiff's Response to Defendants' Rule 56.1 Statement fails to comply with the spirit, if not the letter of the rule. (*See* Pl.'s Resp. to Defs.' Rule 56.1 Statement ("Pl.'s 56.1 Resp.") (Dkt. No. 35).) Many of Plaintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts. (*See, e.g.*, Pl.'s 56.1 Resp. ¶¶ 32, 52, 56, 61, 75, 77, 78, 86, 88, 94, 95, 107, 108, 109, 115, 116, 130, 161, 162, 163, 169, 178, 179, 183, 191); *see also Costello v. N.Y. State Nurses Ass'n*, 783 F.Supp.2d 656, 661 n. 5 (S.D.N.Y.2011)

(disregarding a plaintiff's responses to a defendant's Rule 56.1 Statement where the plaintiff responded with conclusory assertions or legal arguments). Furthermore, a number of Plaintiff's purported denials quibble with Defendants' phraseology, but do not address the factual substance asserted by Defendants. (*See, e.g.*, Pl.'s 56.1 Resp. ¶¶ 29, 40, 52, 56, 58, 101, 103, 106.) In other instances, counsel neither admits nor denies a particular fact, but instead responds with equivocal statements such as: "Admit, but defendant omits the balance of plaintiff's testimony," (Pl.'s 56.1 Resp. ¶ 75), "Admit, but note that she provided no counseling memorandum to plaintiff and never provided a copy of this document to the plaintiff," (*id.* ¶ 86), "Deny. Plaintiff was interviewed one week before he commenced his employment and after he had passed his physical agility and psychological test and after he had been offered employ[ ]ment," (*id.* ¶ 6 (in response to Defendants' statement about the date of Plaintiff's interview and the individuals who conducted the interview)), or "Deny as stated," (*id.* ¶ 29). Some of Plaintiff's 56.1 statement responses include citations to evidence in the record, (*see, e.g.*, Pl.'s 56.1 Resp. ¶¶ 6, 29), however, responses that "do not point to any evidence in the record that may create a genuine issue of material fact[ ] do not function as denials, and will be deemed admissions of the stated fact." *Risco*, 868 F.Supp.2d at 86 n. 2 (internal quotation marks omitted) (quoting *Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 458 n. 1 (S.D.N.Y.2011); *see also Costello*, 783 F.Supp.2d at 661 n. 5 (disregarding the plaintiff's responses where plaintiff failed to specifically dispute defendant's statements)); *Buckman v. Calyon Sec.*, 817 F.Supp.2d 322, 328 n. 42 (S.D.N.Y. 2011) (noting that "56.1 statements not explicitly denied by plaintiff are deemed

admitted"); *Geoghan v. Long Island R.R.,* No. 06–CV–1435, 2009 WL 982451, at *6 (E.D.N.Y. Apr. 9, 2009) ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by. plaintiff for purposes of this motion."). Lastly, several of Plaintiff's purported denials lack citations to admissible evidence or any evidence to support his contention, in violation of Fed. R. Civ. P. 56(c) and Local Rule 56.1. (*See, e.g.,* Pl.'s 56.1 Resp. ¶¶ 4, 137, 138, 141, 155, 199); *see also Holtz,* 258 F.3d at 73–74 (explaining that where there are no citations to admissible evidence, or the cited materials do not support the purported undisputed facts in a party's Rule 56.1 statement, those assertions must be disregarded); *Costello,* 783 F.Supp.2d at 661 n. 5 (disregarding a plaintiff's responses to a defendant's Rule 56.1 statement where the plaintiff failed to refer to evidence in the record). "Allowing a Local Rule 56.1 statement to substitute for the admissibility requirement set forth in Fed.R.Civ.P. 56(e) 'would be tantamount to the tail wagging the dog,'" and "would risk creating tension between Local Rule 56.1 and Fed. R.Civ.P. 56 . . . ." *Holtz,* 258 F.3d at 74 & n. 1 (quoting *Rivera v. Nat'l R.R. Passenger Corp.,* 152 F.R.D. 479, 484 (S.D.N.Y. 1993)).

Plaintiff's counsel's submissions related to the instant Motion fail to cure the deficiencies in Plaintiff's 56.1 Statement and instead impede the Court's attempts to determine which, if any, material facts are in dispute. For example, Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Mem." (Dkt. No. 36)) contains no citations to the record, despite making a number of fact-based arguments. In addition, unlike the usual attorney affirmations, which merely attach copies of documents alleged to be relevant and admissible and identify those documents for the Court, Plaintiff's counsel submitted an affirmation that includes arguments and factual assertions. (*See* Aff. of Michael H. Sussman in Opp'n to Defs.' Mot. ("Sussman Aff.") (Dkt. No. 38).) This affidavit improperly attempts to introduce exhibits without any authentication, (*see* Sussman Aff. ¶ 5), and further contains argument about how the Court should interpret these exhibits, (*id.* ¶ 8 ("An 'investment' of $12,000 is not very significant as against a county budget of over $680,000,000.")). *See also* Fed. R.Civ.P. 56(c)(4) (providing that an affidavit or declaration used to oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated). Accordingly, "[i]n resolving this motion, the Court has relied only on the exhibits to the affirmation that contain admissible evidence, and has not considered the improper assertions and arguments contained in the affirmation, or the exhibits to the affirmation containing inadmissible evidence." *Risco,* 868 F.Supp.2d at 86 n. 2 (citing *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983) ("An affidavit of the opposing party's attorney which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight.")); *see also Little v. City of New York,* 487 F.Supp.2d 426, 433 n. 2 (S.D.N.Y.2007) ("The law is clear that an attorney's affirmation that is not based on personal knowledge of the relevant facts is to be accorded no weight on a motion for summary judgment.").

Plaintiff's Affidavit also contains a surfeit of improper averments, including statements not based on Plaintiff's personal knowledge and conclusory statements that are nothing more than speculation. (*See, e.g.,* Pl.'s Aff. in Opp'n ("Baity Aff.") ¶ 6 (Dkt. No. 37) ("We have progressive discipline at the jail for all officers and had

any superior attached seriousness to these incidents, I would have been given a documented verbal counseling"), ¶ 7 ("[Correctional Officer] Helchowski ... developed a reputation for missing time during his probationary period ... [Plaintiff] had a reputation for excellent attendance and punctuality."), ¶ 8 (describing the evaluation of Correctional Officer Dillon as noting "that he is a young officer learning the job" and concluding that "this is not positive language").) *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 131 n. 12 (2d Cir.2004) (noting that district court was free to disregard hearsay statements and speculation in affidavits); *Flaherty v. Filardi,* No. 03–CV–2167, 2007 WL 163112, *4–5 (S.D.N.Y. Jan. 24, 2007) (disregarding inadmissible portions of a plaintiff's affidavit in analyzing motion for summary judgment); *Morris v. Northrop Grumman Corp.,* 37 F.Supp.2d 556, 568–69 (E.D.N.Y. 1999) (same).

Regrettably, this is not the first time that a court in this courthouse has had to take the extraordinary step of admonishing Plaintiff's counsel concerning his obligations to follow the Local Rules of this Court, as well as several courts' Individual Practices. Plaintiff's counsel has been reprimanded for such conduct a number of times over more than seven years, including as recently as two months ago. *See, e.g., Frawley v. Putnam Hosp. Ctr.,* No. 12–CV–3374, Dkt. No. 83, at 1–2 (S.D.N.Y. July 17, 2014) (ordering Plaintiff's counsel to re-file his client's response to the defendant's Rule 56.1 statements and to conform them with the court's Individual Practices); *Risco,* 868 F.Supp.2d at 86 n. 2 (cataloguing the deficiencies with Plaintiff's counsel's Rule 56.1 response and "admonishing Plaintiff's counsel concerning his obligations to follow the Local and Individual Rules" of the court); *Vero v. Pepsi Cola of the Hudson Valley,* No. 10–CV4112, Dkt. No. 17, at 1 n. 1 (S.D.N.Y.

Apr. 3, 2012) (noting that Plaintiff's counsel "failed to support many of his denials with citations to the record," and further failed to comply with the court's Individual Practices); *Tomlins v. Village of Wappinger Falls Zoning Bd. of Appeals,* 812 F.Supp.2d 357, 361 n. 2 (S.D.N.Y.2011) (admonishing Plaintiff's counsel for repeated failure to follow the court's Individual Practices and declining to consider averments in plaintiff's 56.1 Statement that "[were] not supported by, or that were contradicted by, admissible evidence, or that [were] legal arguments under the guise of undisputed facts" (citations omitted)); *Woods v. Newburgh Enlarged City Sch. Dist.,* 473 F.Supp.2d 498, 504 n. 3 (S.D.N.Y.2007) (admonishing Plaintiff's counsel for failing to cite to the record in his Memorandum and his Rule 56.1 statement, and for including material allegations not otherwise asserted or supported), *aff'd sub nom. Woods v. Newburgh Enlarged City Sch. Dist.,* 288 Fed.Appx. 757 (2d Cir.2008); *Copeland v. Sears, Roebuck & Co.,* 25 F.Supp.2d 412, 417 n. 1 (S.D.N.Y. 1998) (disregarding a denial in plaintiff's 56.1 statement that was not supported by citations to admissible evidence). As Judge Ramos previously remarked about Plaintiff's counsel's filings in *Risco,* "[i]t simply will not do for counsel to say that genuine issues of material fact exist and then rely on the Court to go find them. Much more is expected from an experienced member of the bar of this Court and will henceforth be strictly required." 868 F.Supp.2d at 86 n. 1. At long last, the Court urges Mr. Sussman to take Judge Ramos's warning to heart. At some point, more than an admonition will be appropriate.

Although the Court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the

Court's attention, *Holtz,* 258 F.3d at 73, the net result of Plaintiff's counsel's deficiencies has been to impose on the Court the burden of parsing the entirety of the record in the instant case to ensure that Plaintiff's claims receive thorough and just consideration. Therefore, for the reasons discussed above, in analyzing the instant motion, the Court has disregarded: (1) purported "denials" in Plaintiff's 56.1 Statement that do not actually deny or refute the specific facts asserted by Defendants, are not supported by citations to admissible evidence in the record, are contradicted by other admissible evidence in the record, or that are improper legal arguments; (2) improper assertions and arguments contained in Plaintiff's counsel's affirmation that are clearly not based on personal knowledge or the record; and (3) the improper portions of Plaintiff's Affidavit. However, the Court is "mindful that '[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.'" *Johnson,* 2 F.Supp.3d at 508 (alteration in original) (quoting *Giannullo,* 322 F.3d at 140). Therefore, the Court has only relied upon uncontroverted paragraphs of Defendants' Rule 56.1 Statement where the record evidence duly supports Defendants' contentions.

### B. Factual Background

Plaintiff is an African–American man who applied for a position as a corrections officer with the Rockland County Department of Corrections in either 2005 or 2006. (Decl. of Robert B. Weissman ("Weissman Decl.") Ex. B (Excerpted Tr. of Dep. of Pl. W. Terrell Baity ("Baity Tr.")), at 18 (Dkt. No. 27).) On March 19, 2008 Plaintiff was interviewed for the position by Lieutenant Jill King and Captain John Liska, (*see* Dec. of Captain Jill King ("King Decl.") ¶ 1 (Dkt. No. 30); Decl. of Captain John Liska ("Liska Decl.") ¶ 4 (Dkt. No. 29)), both of whom are Caucasian, (*see* Baity Tr. 22–23). King and Liska ranked Plaintiff second overall in a list of 24 candidates, including a number of Caucasian candidates, and recommended to Chief William Clark ("Clark") that Plaintiff be hired. (*See* King Decl. ¶ 4; Liska Decl. ¶ 7.) Clark accepted King and Liska's recommendation and hired Plaintiff. (*See* King Decl. ¶ 5; Liska Decl. ¶ 8.)

All new corrections officers in the Rockland County Department of Corrections are required to pass a two-year probationary period, during which time the individual works as an at-will employee, and after which a decision is made as to whether to hire the individual as a permanent corrections officer. (*See* Weissman Decl. Ex. C (Tr. of Dep. of Captain William J. Clark ("Clark Tr.")), at 13; Baity Tr. 30.) Plaintiff began working as a probationary corrections officer on June 30, 2008. (*See* Baity Tr. 23.) Plaintiff's performance reviews provided as part of discovery in this case, which date from September 2008 through September 2009, rate Plaintiff's performance as "Satisfactory" in all categories. (*See* Baity Aff. Ex. 1; Sussman Aff. ¶ 9.)

### 1. Gowins Incident

On the morning of September 23, 2009, Plaintiff was involved in an incident with an inmate, Alfred Gowins ("Gowins"). (*See* Baity Tr. 46–47.) The specifics of this incident, though immaterial to the instant case, are not entirely clear. In fact, an internal investigation of the incident by the Rockland County Bureau of Criminal Investigation determined, after interviewing the "[c]omplainants, witnesses and all parties involved" and an "extensive[ ] review"

of the "surveillance tape," found that there was "no evidence to prove or disprove any violation of law." (Weissman Decl. Ex. K (Jan. 8, 2010 Report from Detective Barbera to Captain Conjura), at 1.) According to Plaintiff's September 23, 2009 incident report, which Plaintiff corroborated during his deposition in this case, (*see* Baity Tr. 63), Plaintiff "told inmate Gowins . . . that he had court for the third time in about fifteen minutes . . . [and] that intake was waiting on him to get ready to go to court. (Weissman Decl. Ex. F (Sept. 23, 2009 Mem. from Baity to White ("Incident Report")), at 1.) "Inmate Gowins then began to become hostile[,] [s]aying among other things 'I don't give a fuck if you're a C.O., you['re] still a bitch ass[']." (*Id.*) Plaintiff handcuffed Gowins to take him to an intake holding cell and placed him in the "IV Room so [Gowins] could calm down and . . . get himself together." (*Id.*) In the IV Room, Plaintiff removed Gowins's handcuffs. (*See* Baity Tr. 58.) When Gowins was putting on his shoes, he said, "Just cause you're a C.O. I'm supposed to be scared" and "Whatcha wanna to [sic] do?" while approaching Plaintiff "in an aggressive man[ner]." (Incident Report at 1–2.) Plaintiff told Gowins to place his hands on the wall, but Gowins refused, then resisted Plaintiff's attempt to restrain Gowins. (*Id.* at 2.) Plaintiff then reported that other officers entered the IV Room, "place[d] Inmate Gowins on the floor and handcuffed him." (*Id.*) In his deposition in this case, Plaintiff stated that he and Gowins "were just wrestling," but that "[a]fter the incident with [Plaintiff] and [Gowins], [Gowins] got thrown to the ground . . . [and] may have injured himself then." (Ba-

ity Tr. 62.) The Initial Reportable Incident Report submitted to the New York State Commission of Corrections on September 23, 2009 indicated that Gowins "received injuries to nose and cheekbone while being restrained." (Weissman Decl. Ex. G, at 3.) Plaintiff testified that he had "hurt his back a little bit" during the incident and missed two days of work because of his injury. (Baity Tr. 66.) A video recording captured the incident, however, at various times in the recording, portions of Plaintiff's and Gowins's bodies were not visible or the men were entirely off-screen. (*See* Baity Tr. 71, 77; Sussman Aff. Ex. 3 (video recording).)

On September 28, 2009 Gowins's fiancée and his mother reported that Gowins had been assaulted by Plaintiff on September 23, 2009.[1] (Weissman Decl. Ex. H, at 1.) They further reported that Plaintiff had choked Gowins, "slam[med] his head against the wall," and, after he had been restrained, "kicked inmate Gowins in the face multiple times causing a fractured left ocular, fractured nose and fractured jaw." (*Id.* at 1–2.) They reported that Gowins was "transported to the Nyack ER where his injuries were treated by staff" before Gowins was returned to jail. (*Id.* at 2.) The same day, Detective Beckles from the New York City Police Department's Internal Affairs Unit contacted the Rockland County Sheriff's Department regarding the Gowins incident, noting that Gowins's mother "state[d] that Officer Baity and another Officer assaulted her son on 9/23/09," and that Gowins's mother alleged that Gowins "was kicked and punched in the face and taken to Nyack Hospital with

---

1. In Plaintiff's Rule 56.1 Response, he admitted to Defendants' factual statements regarding this report, but noted that "this report is admitted for notice, not for the truth of whatever was stated as that is plainly hearsay." (Pl.'s 56.1 Resp. ¶¶ 50–51.) The Court notes that it is not considering any of the reports regarding the Gowins incident for the truth of what occurred between Plaintiff and Gowins, but rather for the fact that such reports were made.

a fractured jaw." (Weissman Decl. Ex. I, at 1.)

On October 2, 2009, the Rockland County Sherriff's Department received a fax from L'Tanya Watkins, Esq., noting that she represented Gowins "with respect to serious physical injuries that he incurred as a result of an assault which occurred at the Rockland County Jail on September 23, 2009. (Weissman Decl. Ex. J, (Letter from L'Tanya Watkins to Rockland County Sheriff Department ("Watkins Letter")), at 2.) In the same letter, Ms. Watkins requested "the preservation of any and all video surveillance" related to the incident, and the production of "any written statements taken from Mr. Gowins as a result of this incident." (*Id.*)

On September 21, 2012, Gowins filed suit against Rockland County, Plaintiff, and ten "John Doe" correctional officers in the District Court for the Southern District of New York, alleging violation of his civil rights and police brutality. (Weissman Decl. Ex. L, at 6.) In Gowins's complaint, he alleged that he suffered "severe physical injuries," including "a fractured orbital bone, fractured nose, and injuries to [his] neck and back." (*Id.* at 5.) This suit, *Gowins v. County of Rockland, et. al,* Dkt. 12–CV–7154, is still ongoing. (*See* Defendants' 56.1 Statement ("Defs.' 56.1") ¶ 63; Pl.'s 56.1 Resp. ¶ 63.)

### 2. *Plaintiff's Co–Worker Conflicts*

On December 30, 2009 Plaintiff, who was assigned to the front desk, called the Intake area and spoke to Officer O'Sullivan ("O'Sullivan") via stenophone, a device akin to a speakerphone, which can be overheard by others in the immediate vicinity. (King Decl. ¶ 8.) Plaintiff told O'Sullivan that Plaintiff was sending in a property release form for an inmate to release money to a visiting relative. (*See id.*) O'Sullivan, who had been a corrections officer for twenty years, told Plaintiff that release forms having to do with money are processed through the front desk and that there was no need to send the form to Intake, as Intake has no control over the money. (*See id.*) Plaintiff responded by telling O'Sullivan that Plaintiff knew the proper procedure and that "they'd been doing it [Plaintiff's] way for a long time"— for at least the two or three months that Plaintiff had been at the desk. (*See id.* ¶ 9; Baity Tr. 96–97.) Plaintiff then hung up on O'Sullivan. (Baity Tr. 96.)

O'Sullivan called Plaintiff back, thinking that they had accidentally been disconnected, and tried to explain to Plaintiff that, even though all other property release forms go through Intake, requests for release of money go through the front desk, which is responsible for generating the appropriate checks. (King Decl. ¶ 9.) Plaintiff abruptly ended the conversation. (*See id.* ¶ 9; Baity Tr. 97.) In describing the incident, Plaintiff stated that "O'Sullivan is a hot head and he spoke to me rude[ly]" and characterized the conversation as "an argument between co-workers" of the sort "[t]hat happens in any job." (Baity Tr. 96.) Plaintiff also stated that O'Sullivan was "yelling" and that Plaintiff "didn't have time to argue with him" because of the visitors he needed to assist. (*Id.* at 97.)

King heard the conversations between Plaintiff and O'Sullivan and spoke with Plaintiff, asking him why he kept hanging up on O'Sullivan. (King Decl. ¶ 10.) King testified that Plaintiff denied hanging up on O'Sullivan, (*id.* ¶ 10), though in Plaintiff's Affidavit, he acknowledges that he had hung up on O'Sullivan, (Baity Aff. ¶ 4). Regardless, King told Plaintiff that O'Sullivan was correct in the procedure he explained to Plaintiff and told Plaintiff that he should not have hung up on O'Sullivan and should not be rude to jail staff in the future. (*See* King Aff. ¶ 10; Baity Tr. 98.)

The next day, December 31, 2009, King and Sergeant Mueller ("Mueller") witnessed an incident in which a social worker asked Officer Ludwig ("Ludwig") to call an inmate down from Intake Housing for him. (King Decl. ¶ 12.)[2] Ludwig, who had 25 years of experience at the jail, called Intake Housing, where Plaintiff was working. (*See id.*) According to King, "Ludwig barely got the inmate's name out of his mouth when [P]laintiff stated, 'He refused' and disconnected the stenophone ... [before] Ludwig [had] the opportunity to even explain why the inmate was being requested." (*Id.*) Plaintiff testified that he said "[the inmate] doesn't want to see the social worker," to which Ludwig "said he refused[?], and [Plaintiff] said, yes, he refused." (Baity Tr. 101.)

Mueller and King spoke with Plaintiff about his interaction with Ludwig.[3] Mueller asked Plaintiff why he cut off Ludwig mid-sentence before he was told who was requesting to see the inmate. (King Decl. ¶ 13.) Plaintiff claims to have explained that Ludwig "hangs up on us all the time." (Baity Tr. 102.) Mueller told Plaintiff that it was unprofessional to act that way.[4] Plaintiff also told Mueller that "hanging up on [Ludwig] was a joke, like he does to us." (*Id.* at 103.) Plaintiff explained that

he "didn't think it was something so bad where a grown man was crying or something.... I pressed a button, and that was it." (*Id.* at 102–03.) King and Mueller recall Plaintiff becoming "very defensive," and telling them that "Ludwig was a 'crybaby' to complain" about the incident. (King Decl. ¶ 13.) They explained to Plaintiff that they had witnessed the incident personally, (*see id.*), and Plaintiff told them that "going forward next time [Ludwig hangs up on him] then [Plaintiff would] complain[,] too." (Baity Tr. 103.) At the end of this discussion with Plaintiff, King recalls that "[P]laintiff started to mutter something under his breath about Officer Ludwig that we were unable to clearly hear." (King Decl. ¶ 13.) Plaintiff denies muttering anything at the end of this conversation. (Baity Aff. ¶ 5.)

On January 1, 2010, Muller submitted a memorandum to King that described the December 31, 2009 incident and noted that:

> I was somewhat taken aback by Officer Baity's cavalier attitude in response to my counseling of him. Rather than "man-up" and agree that the acted inappropriately and unprofessionally, he

**2.** The Court notes that Plaintiff purports to deny this fact, however Plaintiff's response does not address the fact asserted by Defendants. (*See* Pl.'s 56.1 Resp. ¶ 77 ("Deny. CO Ludwig, who acted as a runner, called plaintiff and asked if he could see a specific inmate.").) As discussed in section I(A) above, the Court will interpret Defendants' Rule 56.1 Statements that are not addressed by Plaintiff's denials as uncontested, as long as they are supported by facts in the record.

**3.** While Plaintiff "den[ies this fact] as stated," his response does not refute the assertion that both Mueller and King spoke with Plaintiff about his interaction with Ludwig. (*See* Pl.'s 56.1 Resp. ¶ 79 ("Deny as stated. Mueller [not King] was present at D & E wing [where plaintiff was], when the incident occurred.")

(alterations in original).) However, Plaintiff's testimony suggests that both King and Mueller "came to speak with [Plaintiff] about" the incident. (Baity Tr. 102 ("Q. This wasn't just Lieutenant King, this was both of them? A. Yes. She sat him down to talk to me.").)

**4.** Defendants submit that both King and Mueller counseled Plaintiff about his conduct, (Defs.' 56.1 ¶ 81; King Decl. ¶ 13), though Plaintiff claims that King "said nothing in Baity's presence about the matter and plaintiff never received counseling from anyone concerning the matter," (Pl.'s 56.1 Resp. ¶ 81). However, Plaintiff testified that he was told to "let [Ludwig] finish what he was saying" and that his behavior was "unprofessional." (Baity Tr. 102–03.)

spent his efforts deflecting and stating that he was joking. Officer Baity stated that Officer Ludwig is always joking but cannot take a joke in return. . . . After some additional conversation, Officer Baity did acknowledge he was wrong but he was still muttering under his breath about Officer Ludwig as I exited the post. I feel that the attitude shown by Officer Baity is less than desirable and something that we should collective- · ly monitor going forward.

(Weissman Decl. Ex. N (Jan. 1, 2010 Mem. from Mueller to King ("Mueller Mem.")), at 1.)[5] The following day, January 2, 2010, King wrote a memorandum to Captain Conjura in which she described both the December 30, 2009 and December 31, 2009 incidents and concluded that: "I feel that these two incidents involving Officer Baity are of concern especially since this officer is still on probation and may be indicative of future problems. Officer Baity's probation period should be closely monitored." (Weissman Decl. Ex. M (Jan. 2, 2010 Mem. from King to Conjura ("King Mem.")), at 2.)

### 3. Plaintiff's Termination

Chief Clark had "final decision-making power" regarding "passing a [corrections officer] from [his or her] probationary period to permanent [corrections officer status]," though this decision is made "on the input from the supervisors" including the "[s]hift supervisors, lieutenants and the captains and the undersheriff." (Clark Tr. 14.) In some cases, Clark's boss, Undersheriff Tom Guthrie ("Guthrie") became involved in determinations concerning an officer's probationary period as well. (Id. at 19.) Clark's usual practice involved providing about a month's notice to· the captains, lieutenants, and the sheriff that

an officer's probationary period was coming to an end, to allow staff members who had concerns about that officer to raise them with Clark, who could consider those concerns. (Id. at 16–19.) Chief Clark testified that complaints filed by a correctional officer's supervisors are "taken into serious consideration" in determining whether to pass that officer from probationary to permanent status. (Id. at 29.)

With respect to Plaintiff, Clark was ill and out of the office for most of Plaintiff's probationary period. (Id. at 36.) In fact, Clark "didn't speak with [Plaintiff] much during his probationary period, but remembered that "any time [Clark] met him, [Plaintiff] was respectful, [and] looked great in a uniform." (Id. at 35.) Accordingly, Clark testified that he did not make the final determination about whether to pass Plaintiff to permanent corrections officer, but rather "went by the recommendation of the captain [Conjura] and the undersheriff [Guthrie]." (Id. at 36.) In addition "Captain Liska had part of a decision in it, but not much." (Id.)

Captain Conjura ("Conjura") read the King Memo and Mueller Memo and testified that he characterized them, collectively, as a "serious incident." (Weissman Decl. Ex. D (Tr. of Dep. of Joseph Conjura ("Conjura Tr.")), at 88.) According to Conjura, "[we] need a cohesive working environment between staff at the jail[,]" and Plaintiff's behavior as described in the memoranda suggests "a tendency of behavior to be confrontational, not just with one officer but with two in a very relatively short period of time. . . . It goes against a good cohesive working relationship." (Conjura Tr. 88–89.) Clark remembered Conjura noting that "Baity had to go" because "we had an assault pending" that "didn't look good" "[i]n [their] own internal

---

**5.** Plaintiff admits to the content of the memo, but denies Mueller's characterization of their conversation, as explained above. (Pl.'s 56.1 Resp. ¶ 87.)

investigation," because "there were some complaints about Baity, [including about] his attitude," and because "he had an incident with a sergeant ... which is taken very serious[ly] at [the] facility." (Clark. Tr. 37.) Accordingly, Conjura recommended that Plaintiff's probation be terminated before he became a permanent employee. (Conjura Tr. 57–58.) Clark and Conjura testified that Captain Liska also recommended Clark terminate Plaintiff. (Clark Tr. 38; Conjura Tr. 57.) Clark testified that Conjura and Liska "refuted" Clark's "high opinion of Mr. Baity" by telling Clark that Plaintiff "had a bad attitude and [that] he was a problem." (Clark Tr. 44.)

After speaking with Conjura and Liska, Clark called Guthrie to obtain his opinion about whether Plaintiff should be promoted. (*Id.* at 45, 55.) Clark testified that he had previously spoken to Guthrie and that Guthrie was aware of the captains' recommendations. (*Id.* at 56.) Clark relayed his opinion about Plaintiff's employment to Guthrie, (*id.* at 57), and, despite the fact that Clark "wanted to keep Baity," Guthrie said to fire Plaintiff, (*id.* at 55). Conjura prepared the paperwork to terminate Plaintiff's probationary employment, and Clark signed it. (*Id.* 58.)

On June 10, 2010, Plaintiff received a call from Conjura and Liska, informing him that his probationary employment would be terminated and instructing him to turn in his badge, gun, and other equipment. (*See* Baity Tr. 105–06; Weissman Decl. Ex. O (June 10, 2010 Mem. from Conjura to Clark), at 1.) [6] The following day, Plaintiff signed a letter acknowledging that his probationary services were being terminated, effective June 25, 2010 and turned in his badge and gun. (*See* Baity Tr. 107–08; Weissman Decl. Ex. P (Termination of Probationary Servs.), at 1.)

### 4. Other Corrections Officers

In Plaintiff's Complaint, he claims that certain Caucasian corrections officers whose employment records were worse than Plaintiff's have nonetheless been promoted to permanent status. (*See* Compl. ¶ 17 (Dkt. No. 1).) In Plaintiff's responses to Defendants' Interrogatories and in Plaintiff's deposition, he identified these officers as Joseph Helchowski ("Helchowski"), Gregory Dillon ("Dillon"), Gordon Heller, ("Heller"), James Enright ("Enright"), and "Dan." (Baity Tr. 112; Weissman Decl. Ex. W, Pl.'s Answer to Defs.' Interrogatories ¶ 3.)

Plaintiff's only justification for his belief that Helchowski's record was inferior to Plaintiff's was that Helchowski was absent too often during his probationary period, though Plaintiff did not know why Helchowski was absent. (*See* Baity Tr. 112–113.) However, at no point during Helchowski's probationary period did Helchowski's absences exceed his allotment of sick days, personal days, and vacation days. (*See* Liska Decl. ¶ 36.) In addition, there were no complaints about Helchowski during his probationary period. (*See* Clark Tr. 59.) [7] Plaintiff testified that he

---

**6.** In his deposition, Plaintiff admitted that Sheriff Kralik was not the individual who informed Plaintiff that his employment was being terminated and that this information was not relayed on June 30, 2010, as stated in paragraph 15 of Plaintiff's Complaint. (*See* Baity Tr. 108–09).

**7.** Despite Plaintiff's purported denial of this fact in his Rule 56.1 Response, (Pl.'s 56.1 Resp. ¶ 157), Plaintiff does not cite to any evidence that contradicts Defendants' proposed fact. Rather, Plaintiff cites to a paragraph of Plaintiff's Affidavit in which he explains that probationary officers were warned "to miss as little time as possible" and that Helchowski "developed a reputation for missing time," though Plaintiff does not present admissible evidence to contradict Defendants'

was unaware of anything that Helchowski did that was similar to what Plaintiff allegedly did, as documented by the Mueller and King memoranda and the documentation of the Gowins incident, though Plaintiff disputes he did anything wrong in any of the incidents discussed above. (*See* Baity Tr. 113; Pl.'s 56.1 Resp. ¶ 158; Defs.' 56.1 ¶ 159.)

Plaintiff's explanation for how Dillon's record was inferior to his own was that he "got arrested and spent a night in jail, but he still made his probationary period.... So he got off saying he was not guilty." (Baity Tr. 113–14.) In the abstract, Plaintiff's explanation is not incorrect, however, it fails to incorporate several uncontested facts. For example, Dillon was arrested along with the other occupants of the car involved, and charged with criminal possession of a controlled substance in the third degree and criminal possession of a controlled substance in the fourth degree. (*See* Liska Decl. ¶ 10.) He pleaded "Not Guilty," (*id.* ¶ 18), and the drug charges against Dillon were eventually dismissed, (*id.* ¶ 24; Sussman Aff. Ex. 7 (Cert. of Disposition in *New York v. Dillon*), at 1.) The only charge that was not dismissed was a seatbelt violation. (*See* Cert. of Dismissal in *New York v. Dillon*, at 1.) Following the arrest, Liska suspended Dillon with pay on February 16, 2011, which was later changed to suspension without pay on February 18, 2011, when Liska proffered formal departmental charges against Dillon. (*See* Liska Decl. ¶¶ 12, 15, 17.) Liska testified that she then conducted an investigation into the substance of the charges, during which she was informed that the criminal drug charges

against Dillon had been dismissed and the case sealed. (*Id.* ¶¶ 22–25.) On May 27, 2012, Liska dropped the departmental charges against Dillon, at which time he returned to his work as a corrections officer. (*Id.* ¶ 28.)

Dillon is Clark's nephew, and to avoid the appearance of impropriety, Clark recused himself from the review of Dillon's probationary status. (*See* Liska Decl. ¶ 30; Declaration of Former Chief Joseph McDonald ("McDonald Decl.") ¶ 4 (Dkt. No. 28); Clark Tr. 66–67.) Chief Joseph McDonald ("McDonald") was the decisionmaker for the review of Dillon's probationary status.[8] (*See* McDonald Decl. ¶ 5.) Neither Clark, Conjura, Guthrie, nor Sheriff Kralik played a role in reviewing Dillon's probationary status or the decision to make him permanent. (*See* McDonald Decl. ¶¶ 8–10.) Liska recommended that Dillon be made permanent. (*See* Liska Decl. ¶ 34.) On January 27, 2012, McDonald wrote to Dillon to inform him that he had passed probation and that he would be considered permanent as of January 27, 2011. (*See* Weissman Decl. Ex Y (Letter from McDonald to Dillon), at 1; Liska Decl. ¶ 35.)

Lastly, neither Plaintiff nor Conjura could recall any behavioral problems with Heller, Enright, or "Dan" during their probationary terms. (*See* Baity Tr. 112; Conjura Tr. 114–15.) Nor is there any evidence in the record to support a finding that these officers had behavioral problems. In fact, the performance reviews of Enright and Heller produced by Defendants show almost exclusively "Satisfactory" ratings across all performance categories. (*See* Sussman Ex. 6.)

---

assertion that "no complaints" were made about Helchowski. (*See* Baity Aff. ¶ 7.)

8. The Court notes that, while Plaintiff admits this fact, his 56.1 Statement Response does not directly pertain to this fact, but rather

states that Plaintiff "[a]dmit[s] that Gutherie did not interpose any objection to Dillon's being made permanent despite his having served a 74 day[ ] primarily unpaid suspension." (*See* Pl.'s 56.1 Resp. ¶ 188.)

## C. Procedural History

Plaintiff filed his Complaint on January 20, 2012. (*See* Dkt. No. 1.) Defendants County of Rockland and James F. Kralik in his official capacity filed an Answer on March 16, 2012. (*See* Dkt. No. 4.) Following discovery, on February 18, 2014, Defendants filed their Motion for Summary Judgment along with a Memorandum in Support ("Defs.' Mem."), a Declaration of Robert B. Weissman in Support, a Rule 56.1 Statement, and several other Declarations in Support. (*See* Dkt. Nos. 25–32.) Plaintiff filed his Memorandum in Opposition along with an Affidavit of the Plaintiff in Opposition, an Affidavit of Michael H. Sussman in Opposition, and a Rule 56.1 Response and Counterstatement. (*See* Dkt. Nos. 35–38.) Defendants filed a Reply Memorandum of Law ("Defs.' Reply Mem.") and a second Declaration of Robert B. Weissman in Support ("Weissman Second Decl."). (*See* Dkt. Nos. 33–34.) The Court held oral argument on September 12, 2014. (*See* Sept. 12, 2014 Oral Argument Transcript ("Sept. 12, 2014 Tr.").) On September 15, 2014, Plaintiff submitted an additional letter to supplement his earlier filings in this case, per the Court's invitation at oral argument. (*See* Letter from Pl. to Court (Sept. 15, 2014) ("Pl.'s Supp. Letter") (Dkt. No. 40).) The Court asked for this letter because Plaintiff's counsel tendered new arguments at oral argument in opposition to the Summary Judgment Motion. On September 17, 2015, Defendants submitted a letter in response to Plaintiff's supplemental letter. (*See* Letter from Defs. to Court (Sept. 17, 2014) ("Defs.' Supp. Letter") (Dkt. No. 41).)

## II. DISCUSSION

### A. Standard of Review

Before the Court is Defendants' Motion for Summary Judgment. Summary judgment shall be granted where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.2014) (same). "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care L.L.C. v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir.2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.2011) (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL Nos. 1358, M21–88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir.2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Schatzki v. Weiser Capital Mgmt., L.L.C.*, No. 10–CV–4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

"In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. No. 1*, 16 F.Supp.3d 294, 314, 2014 WL 1621292, at *12 (S.D.N.Y. Apr. 22,

2014) (same). Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13–CV–230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Price-Waterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir.2013) (alterations, citation, and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . ., [a non-movant] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial," *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir.2012) (emphasis and internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11–CV–2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir.2009)).

"A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Indeed, "[b]ecause writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* Still, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001). In fact, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Beale v. Mount Vernon Police Dep't*, 895 F.Supp.2d 576, 583 (S.D.N.Y.2012) (internal quotation marks omitted); *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (same). Thus, the Supreme Court has "reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks omitted).

### B. Analysis

#### 1. Plaintiff's Individual Capacity Claim

In addition to claims against Rockland County and Sheriff Kralik in his official capacity, Plaintiff's Complaint purports to assert a claim against Kralik in his individual capacity. (*See* Compl. ¶¶ 4–5.) Defendants claim that Plaintiff failed to personally serve Kralik, pursuant to the applicable Federal and New York state rules and that all individual claims against him should therefore be dismissed. (*See* Defs.' Mem. 2.) Under Rule 4(e) of the Federal Rules of Civil Procedure, service may be effected on an individual by:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed.R.Civ.P. 4(e)(1)-(2).

■ Plaintiff does not claim to have served Kralik personally or at his home. (*See* Pl.'s Mem. 8.) Rather, Plaintiff asserts that "the County Clerk accepted service on his behalf as his apparent agent." (*Id.*) However, the affidavit of service upon which Plaintiff relies identifies the individual at the county clerk's office who accepted service, but includes no indication that she was authorized to accept service on behalf of Kralik as an individual, or that she represented the same. (*See* Weissman Decl. Ex. S (Aff. of Service), at 1.) Instead, the affidavit states that the process server "served the summons on Kaitlyn Quinn–Clerk, who is designated by law to accept service on behalf of County of Rockland Clerk O/B/O/ Kralik." (*Id.*) Plaintiff has provided no evidence that Kralik designated the county clerk to receive service of process on his behalf pursuant to N.Y. C.P.L.R. 318, nor has Plaintiff even suggested that such authorization exists. (*See* Pl.'s Mem. 7–8.) The county clerk is authorized by N.Y. C.P.L.R. § 311(a)(4) to accept service of process for the county and, by extension, county officials in their official capacity. However, such a statute does not render service on the clerk sufficient service for an individual sued in his individual capacity. *See, e.g., Bogle–Assegai v. Connecticut,* 470 F.3d 498, 507–08 (2d Cir.2006) (affirming the dismissal of claims against individual defendants where

the plaintiff served the attorney general's Office under an analogous Connecticut service statute but did not provide for personal service). Moreover, even if the clerk had represented to Plaintiff's process server that she was authorized to accept service for Kralik in his individual capacity, there is no evidence in the record of any appointment, or that Kralik knew that the clerk made such a representation, and therefore service cannot be sustained under N.Y. C.P.L.R. § 308(3). *See Jackson v. Cnty. of Nassau,* 339 F.Supp.2d 473, 479 (E.D.N.Y.2004) (noting that "representations made by an individual who accepts service of process are not binding on the defendant in the absence of proof that the defendant himself knew of such representations," and that "accepting process for another party does not mean the acceptor was appointed to do so" (internal quotation marks omitted)). Thus, Plaintiff has not demonstrated that it has served Kralik under the means provided by Federal Rule of Civil Procedure 4(e)(2).

Pursuant to Rule 4(e)(1), the Plaintiffs may also effect service on the Individual Defendants by following New York law. Pursuant to New York Civil Practice Laws and Rules § 308(2), a natural person may be served by

delivering the summons within the state to a person of suitable age and discretion at the actual place of business ... of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business in an envelope bearing the legend "personal and confidential" ... within twenty days of [the delivery].

N.Y. C.P.L.R. § 308(2). "New York courts have construed 'actual place of business' to include (1) a place where the de-

fendant regularly transacts business, or (2) an establishment that the defendant owns or operates, where there is a clear identification of the work performed by her within that place of business." *Velez v. Vassallo,* 203 F.Supp.2d 312, 325 (S.D.N.Y.2002) (citations and internal quotation marks omitted).

■ Here, Plaintiff does not contest the fact that Kralik left office in December 2011 and was replaced by Sheriff Louis Falco on January 2, 2012. (Defs.' 56.1 ¶¶ 135–36; Pl.'s 56.1 Resp. ¶¶ 135–36.) Thus, Kralik was no longer employed by the County at the time Plaintiff commenced this action on January 20, 2012, and service at a county office simply cannot amount to personal service at Kralik's "actual place of business" pursuant to N.Y. C.P.L.R. § 308(2). *See Colvin v. State Univ. Coll. at Farmingdale,* No. 13–CV–3595, 2014 WL 2863224, at *14 (E.D.N.Y. June 19, 2014) ("A defendant's 'actual place of business' is his or her 'business address at the time of service, and not when the cause of action arose.'" (quoting *Jackson,* 339 F.Supp.2d at 478)). Perhaps as testament to the weakness of this argument, Plaintiff does not even suggest that the Court should find Kralik to have been served at his place of business. (*See* Pl.'s Mem. 7–8.)

In addition to the fact that Plaintiff's actions do not satisfy the statutory requirements for service upon an individual defendant, Defendants' Answer, which in its very first sentence clearly identifies the party answering the Complaint as "Defendant County of Rockland, also [sued herein as] James F. Kralik sued . . . in his official capacity as Sheriff, County of Rockland," (Answer at 1 (Dkt. No. 4))—and the absence of any motion to dismiss or answer filed by Kralik in his individual capacity— should have placed Plaintiff and his counsel on notice that Kralik had not been properly served. Indeed, this is not the first case involving deficient service by Plaintiff's counsel, as Plaintiff previously initiated an action against Kralik relating to Plaintiff's employment with Rockland County in which Plaintiff failed to serve Kralik, despite having appropriately served the County. (See *Baity v. Kralik,* No. 10–CV–8127 (Dkt. No. 5) (granting Plaintiff's request to dismiss the case without prejudice to permit service of Kralik).) More than 120 days have elapsed since the filing of this lawsuit, yet Plaintiff, who is represented by counsel in this action, has not provided the Court with a reason for his failure to serve Kralik, or, for that matter, sound grounds for Plaintiff's purported belief that service of the Rockland County Clerk's Office was sufficient to provide for personal service of Kralik. The Court will therefore dismiss Plaintiff's claims against Kralik in his individual capacity. *See, e.g., Hailey v. Connecticut,* No. 10–CV–1787, 2011 WL 6209748, at *3– 4 (D.Conn. Dec. 14, 2011) (granting the defendant's motion to dismiss where the "[p]laintiff has failed to serve [the defendants] in their individual capacities" as required by state law); *Chen v. Holder,* No. 10–CV–2432, 2011 WL 6837761, at *7– 9 (E.D.N.Y. Dec. 29, 2011) (dismissing claims against a defendant in his individual capacity due to insufficient service, where the plaintiff failed to serve the defendant at his "actual place of business" and was given opportunities to cure the service defect but failed to do so); *Davis v. Mara,* 587 F.Supp.2d 422, 427 (D.Conn.2008) (granting a motion to dismiss claims against state employee defendants in their individual capacities because the plaintiff failed to effectuate personal service according to state law, where service was accepted by the Connecticut Office of the Attorney General, but where defendants had not authorized the office to accept service on their behalf in their individual

capacities); *Richards v. N.Y. State Dep't of Corr. Servs.,* 572 F.Supp. 1168, 1173 (S.D.N.Y.1983) (granting a motion to dismiss claims against two defendants in their individual capacities where they were not personally served, despite the plaintiff's attempts to serve these defendants through their co-workers).

Plaintiff objects to the fact that Defendants never raised the failure to serve Kralik prior to their Motion for Summary Judgment and suggests that Defendants should be barred from relying on failure to serve as grounds for an affirmative defense. (*See* Pl.'s Mem. 8.) However, Kralik has never appeared in his individual capacity in this case. (*See* Defs.' 56.1 ¶ 141; Pl.'s 56.1 Resp. ¶ 141 (denying this fact, but providing *no citation* to the record, nor making any statement to the contrary that would refute it).) Defendants' official filings conspicuously omit the phrase "in his individual capacity" when referencing the parties represented by Defendants' counsel, (*see* Answer at 1 (Dkt. No. 4) ("James F. Kralik sued … in his official capacity as Sheriff" (alterations in original)); Defs.' 56.1 (filed "[o]n behalf of defendant County of Rockland (also s/h/a James F. Kralik sued in his official capacity)"); Notice of Motion (Dkt. No. 26) (brought only by the County of Rockland).) Unfortunately, Defendants' correspondence with the Court has been less clear with respect to counsel's limited representation. (*See* Letter from Defs. to Court (Apr. 25, 2013) (Dkt. No. 11) ("We represent the County of Rockland and James F. Kralik in the above-referenced § 1983 employment civil rights suit."); Letter from Defs. to Court (June 18, 2013) (Dkt. No. 14) ("We represent the defendants in this employment civil rights case."); Letter from Defs. to Court (Aug. 22, 2013) (Dkt. No. 15) (same); Letter from Defs. to Court (Nov. 21, 2013) (Dkt. No. 19) (same).) Nonetheless, Plaintiff has not of-fered an acceptable reason for his failure to properly serve Kralik in his individual capacity.

■ At oral argument, Defense counsel informed the Court that counsel has not contacted Kralik and does not know where he is located. (*See* Sept. 12, 2014 Tr. 13–14.) Moreover, when asked by the Court about the nature of Kralik's personal involvement and whether Kralik was served, Plaintiff's counsel could only express his "view" that "if [Kralik] has the responsibility on behalf of the County … if there [are] discriminatory actions taken by his second, his undersheriff, making such a direction, [Kralik] is responsible," and that he further believed "that the County was accepting service for Kralik in all his capacities" despite the fact that he was the former sheriff and was no longer in office. (*See id.* at 48–50.) Plaintiff conceded that he does not "allege that Kralik did [anything] at all … that violated [Baity's] rights," but maintained that Kralik is nonetheless responsible for the decisions made by the undersheriff. (*See* Sept. 12, 2014 Tr. 46–47.) However, Plaintiff has failed to provide the Court with *any* legal authority to support his contention that supervisory responsibility is sufficient grounds for individual liability under § 1983 here, despite ample time to do so, especially where there is *no* evidence that Kralik ever knew about the subordinate's decision, let alone that it might have been discriminatory. To the contrary, the law in the Second Circuit is clear that "a supervisor may be held liable [under § 1983] if he or she was personally a 'direct participant' in the constitutional violation," and that "a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso,* 764 F.3d 217, 234 (2d Cir.2014). Thus, even if Kralik had been

properly served in his individual capacity, the record is not sufficient to support Plaintiff's § 1983 claim against him. *See, e.g., Armstrong v. Metro. Transp. Auth.,* No. 07–CV–3561, 2014 WL 4276336, at \*26 (S.D.N.Y. Aug. 28, 2014) (dismissing the plaintiff's § 1983 claim against the defendants in their individual capacities where "nothing in the record" suggests that the defendants were personally involved in the conduct forming the basis for the plaintiff's claim).

### 2. *Monell Liability*

■ Plaintiff's remaining claims are against the Rockland County and against Kralik in his official capacity, which is tantamount to a claim against the municipality itself. *See Lore v. City of Syracuse,* 670 F.3d 127, 164 (2d Cir.2012) ("A claim asserted against an individual in his official capacity . . . is in effect a claim against the governmental entity itself . . . for 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.' " (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978))). Plaintiff's Complaint asserts a cause of action solely pursuant to 42 U.S.C. § 1983. (*See* Compl. ¶ 20.) [9] The law of the Second Circuit is clear that "local governing bodies . . . may

be sued directly under § 1983 only where a violation of rights resulted from the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Fierro v. N.Y.C. Dep't of Educ.,* 994 F.Supp.2d 581, 588 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Nagle v. Marron,* 663 F.3d 100, 116 (2d Cir.2011)).

■ Rather than engage with Defendants' contention that Plaintiff has not demonstrated the existence of a Rockland County policy or custom sufficient to provide grounds for *Monell* liability, Plaintiff's Memorandum in Opposition makes the bold argument that a provision of the County's charter obviates the need to examine the County's *Monell* liability at all. (*See* Pl.'s Mem. 9–10.) By Plaintiff's account, several provisions of the County's Code require the County to "assume responsibility for . . . the discriminatory acts of any employee of the Sheriff's office" regardless of whether they were pursuant to a custom or policy. (*See id.*) In short, Plaintiff argues that, through these provisions, Rockland County accepts vicarious liability for Sheriff office personnel and waives the *Monell* requirements for § 1983 claims against the County.[10] This argument is unavailing.

---

**9.** The Complaint contains two paragraphs numbered "20," but only the second of these describes the nature of this Action.

**10.** Plaintiff makes this argument without citing a single case—either from within the Second Circuit or without. In fact, the only citations in this portion of Plaintiff's Memorandum in Opposition are to portions of the Rockland County Code concerning indemnification, the "most significant[ ]" of which is § 169–4, which provides that: "Any act or omission of any employee of the County in the Office of the Sheriff done or made in the performance of an official duty . . . shall be the act or omission of the County, and the

damages, if any, resulting therefrom shall be deemed the liability of the County of Rockland." (Pl.'s Mem. 9 (quoting County of Rockland Code § 169–4).) (Plaintiff did not provide the Code provisions along with its supplementary materials, but this provision is available at http://ecode360.com/9665296.) To the extent that Plaintiff argues that §§ 45–2 and 45–3 of the code, which explicitly provide for the indemnification of county employees, apply in this case, the Court rejects this argument in light of § 45–5 of the code, which provides that the indemnification provisions therein shall "inure only to employees as defined herein" and "shall not enlarge or diminish the rights of any other party." (*See* Coun-

While 42 U.S.C. § 1988 provides an avenue for the application of state law in federal civil rights actions, including § 1983 claims, it only permits the use of state law that "is not 'inconsistent with the Constitution and the law of the United States.'" *Jund v. Town of Hempstead*, 941 F.2d 1271, 1279 (2d Cir.1991) (quoting *Burnett v. Grattan*, 468 U.S. 42, 48, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984)). Here, Plaintiff's purported application of the Rockland County Code runs directly counter to federal law, specifically the Supreme Court's interpretation of § 1983 liability in *Monell*, which held that "it is [only] when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Furthermore, the imposition of vicarious liability is "incompatible with § 1983's causation requirement." *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir.2007); *see also City of Canton v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (same). Therefore, the Court will not adopt Plaintiff's novel reading of the Rockland County Code as providing vicarious grounds for § 1983 liability that circumvent the requirement that Plaintiff demonstrate liability under *Monell* without resorting to the principle of respondeat superior.

The Court's rejection of Plaintiff's argument comports with the conclusion of every court to have considered it. While it does not appear that any court in the Second Circuit has specifically addressed this issue, a number of other circuits have, and have held that state and municipal vicarious liability statutes may not provide the grounds for a § 1983 action. *See Siler v. Webber*, 443 Fed.Appx. 50, 53 (6th Cir. 2011) (holding that a Tennessee statute, which created a state-law cause of action

against a county for any injury resulting from any act or failure to act on the part of a deputy, and thus allowed vicarious liability, conflicted with § 1983, which did not, and thus could not be used to maintain a federal action against county under § 1983); *Henley v. Edlemon*, 297 F.3d 427, 430 n. 6 (5th Cir.2002) (rejecting Plaintiff's attempt to rely on state law vicarious liability statute as grounds for liability "in their § 1983 suit because it is inconsistent with federal law"); *Palmer v. Sanderson*, 9 F.3d 1433, 1438 (9th Cir.1993) (holding that "a state statute imposing vicarious liability" to be "inconsistent with the laws of the United States," and thus cannot be the basis for a § 1983 action (alteration omitted and internal quotation marks omitted)).

Plaintiff's Memorandum in Opposition makes no mention of Defendants' argument that Defendants cannot be held liable under *Monell*, apart from Plaintiff's summary statement that "the county's extensive discussion of *Monell* liability is misplaced and ignores the assumption of responsibility for the acts and omissions of all employees of the Sheriff's department, as set forth in the charter." (Pl.'s Mem. 10.) Accordingly, the Court could find Plaintiff to have abandoned any claim that *Monell* liability applies. *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) (noting that "in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned"); *Parrilla v. City of New York*, No. 09–CV–8314, 2011 WL 611849, at *1 n. 4 (S.D.N.Y. Feb. 16, 2011) (finding that the plaintiff's § 1983 claim to have been abandoned where the "[p]laintiff failed to address or oppose [the d]efendants' arguments re-

ty of Rockland Code §§ 45–2, 45–3, 45–5 (available at http://ecode360.com/9663634).)

garding municipal liability or qualified immunity"); *Broadhurst v. Cnty. of Rockland,* No. 07–CV–9511, 2011 WL 5142760, at *7 (S.D.N.Y. Oct. 31, 2011) (finding the plaintiff to have abandoned her § 1983 claims where she failed to address any of the defendant's arguments against *Monell* liability on behalf of the county). Instead, the Court will address Plaintiff's other theories of *Monell* liability in this case, noting that they have been a moving target, as will be discussed below.

■ As the Court has already discussed above, "when the defendant sued for discrimination under … § 1983 is a municipality—or an individual sued in his official capacity—the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 226 (2d Cir.2004) (citations omitted) (citing *Monell,* 436 U.S. at 692–94, 98 S.Ct. 2018). "To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation." *Patterson,* 375 F.3d at 226 (citing *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992)). "It is sufficient to show, for example, that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials." *Patterson,* 375 F.3d at 226 (citations and internal quotation marks omitted).

Here, Plaintiff makes no suggestion that Rockland County has an express policy of discrimination. To the contrary, the County has an Equal Employment Opportunity Policy that expresses the County's commitment "to hiring and maintaining access to employment and advancement for qualified individuals regardless of their … color … [or] race," which Plaintiff has acknowledged receiving. (See Baity Tr. 116–17; Weissman Decl. Ex. V (County of Rockland Equal Employment Opportunity Policy).) The fact that the County has such a policy is hardly surprising. *See Jimenez v. City of New York,* 605 F.Supp.2d 485, 530 (S.D.N.Y.2009) ("Obviously the City of New York does not promulgate any official policy of discrimination along the lines plaintiff suggests. A trip to the City's web site reveals just the opposite; the City claims to be an equal opportunity employer."). Regardless, Plaintiff identifies no evidence that the County has an explicit policy of discriminatory hiring.

■ Nor is there evidence in the record that could support a reasonable jury's finding of a persistent or widespread practice of discrimination. *See Patterson,* 375 F.3d at 226. Plaintiff makes no allegation that the County has a history of failing to hire correctional officers who are racial minorities or failing to promote the same after their mandatory probationary periods. In fact, Defendants have submitted unrefuted evidence that the hiring demographics support the opposite conclusion. (*See* Defs.' 56.1 ¶¶ 202–03; Liska Decl. ¶¶ 2–3.) While Plaintiff purports to "[d]eny the relevance of this" evidence, (Pl.'s 56. 1 Resp. ¶¶ 202–03), he provides no contradictory evidence, anecdotal or otherwise, nor proffers any reason to believe that the employment information provided by Defendants is unreliable. Specifically, Defendants have provided evidence that "14 African–American corrections officers have come up for review" for permanent status since 2003 and only Plaintiff and one other officer, who "was caught corresponding with the female inmates whom he was supposed to be supervising and was terminated," have not been promoted to permanent status. (Liska Decl. ¶ 2.) By way of comparison, "four

Caucasian officers did not pass their probationary periods." (*Id.* ¶ 3.) Such information may ultimately prove insufficient basis for a factfinder to entirely rule out discrimination, however, in light of Plaintiff's complete failure to identify any evidence whatsoever of a persistent or widespread practice of discrimination and Plaintiff's further failure to respond to the anecdotal evidence that Defendants provide as evidence of the absence of such a pattern, the Court finds that no reasonable juror could view the facts to suggest such a pattern.

Lastly, Plaintiff could satisfy *Monell's* "policy, custom, or practice" requirement by demonstrating "actions taken or decisions made by government officials responsible for establishing municipal policies...." *Albert v. City of Hartford,* 529 F.Supp.2d 311, 329 (D.Conn.2007) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)); *see also Chin v. N.Y.C. Hous. Auth.,* 575 F.Supp.2d 554, 561 (S.D.N.Y. 2008) ("[T]he acts and pronouncements of a single official may constitute policy for which the municipality is liable if that official is the 'final policymaker' in the area at issue." (citing *St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), and *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000))). While Plaintiff failed to make this claim in either his Complaint or his Memorandum in Opposition to Defendants' Motion, Plaintiff first asserted at oral argument that Kralik was a policymaker and that his role in Plaintiff's termination is a basis to hold Rockland County liable under *Monell.*[11] (*See* Sept. 12, 2014 Tr. 57–58; Pl.'s Supp.

Letter 9.) He adopted this position even though the evidence introduced by the Parties in connection with the instant Motion does not suggest *any* involvement by Kralik in the employment decision at issue in this case. Indeed, in his Memorandum in Opposition, Plaintiff acknowledged that it was "Undersheriff [Guthrie] who told [Clark] to fire the [P]laintiff." (Pl.'s Mem. 5.) Despite this unacknowledged, yet total, shift in the person Plaintiff blames for his termination, Plaintiff nonetheless maintains that "the County cannot escape liability for the actions of Undersheriff Guthrie even if they are not fairly attributed to defendant Kralik, the person who delegated authority to make them to him." (*Id.* at 10.)

"Whether or not a single individual possesses final policymaking authority is an issue of state law." *Chin,* 575 F.Supp.2d at 562 (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (internal quotation marks omitted)); *see Bliven v. Hunt,* 579 F.3d 204, 214 (2d Cir.2009) ("The matter of whether a given official is a municipal policymaker is a question of law."); *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir.2008) (noting that "[w]hether an official has final policymaking authority is a legal question, determined on the basis of state law"). However, "[t]he individual need not possess general policymaking authority, but rather only authority to formulate policy governing that particular conduct at issue." *Chin,* 575 F.Supp.2d at 562 (citing *Jeffes,* 208 F.3d at 57 ("[T]he official in question need not be a municipal policymaker for all purposes. Rather, with re-

---

11. Moreover, Plaintiff has made no allegations whatsoever, nor has he identified any evidence, that would suggest municipal liability premised on a failure to train or supervise municipal employees, or deliberate indifference to discriminatory acts by employees.

*See Jeffes,* 208 F.3d at 61–62 (noting that "municipal liability may be premised on the municipality's failure to train its employees where that failure to train reflects deliberate indifference to constitutional rights" (citations and internal quotation marks omitted)).

spect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business." (Citations and internal quotation marks omitted))); *see also Roe,* 542 F.3d at 37 (2d Cir.2008) (noting that "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit"). "The Second Circuit has made clear that 'where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law.'" *Albert,* 529 F.Supp.2d at 329 (alteration omitted) (quoting *Jeffes,* 208 F.3d at 57–58); *see also Pignone v. Vill. of Pelham Manor,* No. 10–CV–2589, 2014 WL 929805, at *4 (S.D.N.Y. Mar. 6, 2014) (noting that "[a] plaintiff bears the burden of establishing an official's status as a final policymaker with proof of the official's scope of employment and his role within the municipal or corporate organization"). Thus, in order for the County to be liable for Kralik's actions, Plaintiff must demonstrate that Kralik was a "policymaker with respect to the particular issue involved here." *Jeffes,* 208 F.3d at 58 (internal quotation marks omitted). "A subordinate officer, although not a final policymaker, may also expose a municipality to liability, if a policymaker ordered or ratified the subordinate's actions." *Williams v. City of New York,* 690 F.Supp.2d 338, 344 (S.D.N.Y.2010) (citing *Amnesty Am.,* 361 F.3d at 126). "The critical characteristic of final policymakers when employment is at issue is whether the municipal official has authority to formulate the rules governing personnel decisions rather than authority to make decisions pursuant to those rules—e.g., the

hiring and firing of subordinates." *Williams,* 690 F.Supp.2d at 344 (internal quotation marks omitted); *see also Pembaur,* 475 U.S. at 483 n. 12, 106 S.Ct. 1292 (noting that the discretion to hire and fire municipal employees does not render an official the final policymaker for employment matters).

With respect to Kralik's hiring and firing authority, the Rockland County Code provides that "[t]he Sheriff may, within the appropriations provided therefor, appoint jailers, ... and such other officers and employees as may be necessary to operate the County Jail facilities." County of Rockland Code § 5–148(c) (available at http://ecode360.com/9663359). The Sheriff's appointment and termination power is circumscribed by New York's Constitution, which places a sheriff's appointees under the civil service system. *See Jeffes,* 208 F.3d at 59 ("Prior to 1990, the [New York] Constitution provided that 'the county shall never be made responsible for the acts of its sheriff.' As a result of that provision, a sheriff's appointees were considered to be the employees of the sheriff himself, rather than of the city or county in which he operated, and most were regarded as beyond the scope of the civil service system. After the State constitution was amended in 1990 to delete the provision relieving counties of liability for the acts of their sheriffs, the amendment was interpreted by the State legislature and the State courts to mean that all sheriffs' employees are to be included in the civil service system." (citations and alterations omitted)). Thus, while the Sheriff has the power over employment decisions regarding correctional officers such as Plaintiff, he is nonetheless constrained by the policies pertaining to members of the Rockland County civil services system, including the County's Equal Employment Opportunity Policy. *See, e.g., Chin,* 575

F.Supp.2d at 566 (holding that the New York City housing authority controller might be a "final decisionmaker" but not a "final policymaker" because he "was not authorized to exercise his power arbitrarily" but rather was "constrained by the [housing authority's] employment policies as promulgated by the commissioners" and noting *arguendo* that if "his treatment of [the] plaintiff violated those policies, such violation would constitute a deviation from agency policy rather than a reformulation"); *Albert,* 529 F.Supp.2d at 330 (holding that the Police Chief was not a policymaker, because his decisionmaking was "constrained by policies set forth in the Personnel Rules, the Court of Common Council and the City Manager" as well as by the city charter, which contained an anti-discrimination provision). *But see O'Connor v. Barnes,* No. 97–CV1489, 1998 WL 1763959, at *6 (S.D.N.Y. Mar. 18, 1998) (holding that "the retaliatory actions alleged by the [whistler-blower] plaintiffs fall within the scope of [the County Sheriff's] policymaking authority," because he "was acting within his policymaking authority over the operations of his department and its employees" when the Sheriff instructed and encouraged harassment of the plaintiffs). In addition to delineating the rights provided to employees, the County's Equal Employment Opportunity Policy also provides that "[t]he County Executive has the responsibility for operating an effective Equal Employment Opportunity Program" and vests the "responsibility for coordination, implementation[,] and administration of the County's Equal Employment Opportunity Policy" in the "Director of Employee Rights and Equity Compliance." (Weissman Decl. Ex. V

("EEO Policy"), at 3). The EEO Policy also vests the County Executive with the "authority to approve or reject policy and action taken by the Director" of Employee Rights and Equity Compliance, (EEO Policy at 7), while requiring all department heads, such as Sheriff Kralik, to "adhere[ ] to and tak[e] all necessary steps to implement the County's equal opportunity employment plan" in a way that "maintain[s] access to employment and advancement for qualified individuals regardless of their" color or race. (*Id.* at 2, 9, 10). As Defendants correctly note, Kralik's power to hire and fire employees in his department is thus constrained by the County's policy regarding equal opportunities for employment. (*See* Defs.' Mem. 7.)[12]

The Supreme Court, in parsing the difference between discretionary authority and policymaking authority, provided a hypothetical that Defendants submit is highly analogous to the instant case:

[F]or example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees

---

12. Defendants note that, under New York State law, "a sheriff may appoint jailers, but only such jailers 'as may be authorized by the board of supervisors' " and that "the sheriff cannot appoint more than one deputy for

every three thousand inhabitants of the county" absent board authorization of additional deputy sheriffs. (*See* Defs.' Supp. Letter 3 (quoting N.Y. County Law § 652).)

and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff' decisions *would* represent county policy and could give rise to municipal liability.

*Pembaur,* 475 U.S. at 483 n. 12, 106 S.Ct. 1292. Here, as in the *Pembaur* hypothetical, Kralik has the authority to fire and hire employees under the Rockland County Charter, but he is nonetheless limited by a policy that is beyond his control, the County's Equal Opportunity Employment Policy. That such policy applies to Plaintiff's case is clear from the fact that Plaintiff signed an acknowledgment of receipt of the County's Policy and has confirmed receiving the same. (*See* Baity Tr. 116–17; Weissman Decl. Ex. U (June 30, 2008 Acknowledgment of Receipt of Copy of the County's Equal Employment Opportunity Policy signed by Plaintiff), at 1.) Defendants argue that, in keeping with the Supreme Court's thinking in *Pembaur,* even if Kralik had fired Plaintiff in violation of the County's Equal Opportunity Employment Policy, Plaintiff would not be able to establish municipal liability under a policymaker theory. While, on its face, *Pembaur's* hypothetical appears to be directly applicable here, the resolution of the situation described therein, upon which Defendants rely, arguably is dicta. Moreover, *Pembaur's* hypothetical appears to contemplate a situation in which specific employment policies are set by the Board of County Commissioners, whereas here the record contains no evidence of constraints on Kralik's employment authority other than the County's broad EEO Policy.

When presented with similar situations, a number of courts in the Second Circuit have found that the authority to make individual employment decisions was not sufficient to make an official a policymaker for the purposes of *Monell* liability. *See, e.g., Hardy v. Town of Greenwich,* No. 06–CV–833, 2009 WL 2176117, at *6 (D.Conn. July 22, 2009) (holding that, "while [the chief of police] certainly enjoyed discretion to decide which employees to appoint to specialized units," that discretion was constrained by the town's policies and the oversight of the [police commissioner] and that the [c]hief of [p]olice was therefore not the final policymaker for the claims at issue); *Chin,* 575 F.Supp.2d at 565–66 (finding that the plaintiff's supervisor was not a final policymaker regarding employment practices where the city charter vested that authority elsewhere and the supervisor's discretion was constrained by municipal policy); *Albert,* 529 F.Supp.2d at 330–31 (holding that the police chief was not the final policymaker as to the hiring and firing of employees where his discretion was constrained by city policies, including an anti-discrimination policy); *Knight v. Hartford Police Dep't,* No. 04–CV–969, 2006 WL 1438649, at *20 (D.Conn. May 22, 2006) (granting summary judgment to the defendants on grounds that the police chief was not a policymaker because his "powers to appoint or remove—including his power to make promotions—are expressly made 'subject to' the antidiscrimination provisions of Chapter XVI. In contrast to this grant of discretion with respect to employment decisions, the [p]olice [c]hief is given authority to make rules and regulations—in conformity with city ordinances—concerning the operation of the department and the conduct of its employees."); *Looby v. City of Hartford,* 152 F.Supp.2d 181, 188–89 (D.Conn.2001) (holding that the chief of the Hartford fire department was not the final policymaker with respect to personnel decisions within the department despite broad discretion to make person-

nel decisions, given the language of the Hartford city charter and the fact that the chief's discretion was constrained by anti-discrimination policies of the city).

In addition, another court in this district, when considering the issue of whether Rockland County could be held liable for discrimination based on a single act by a municipal employee, found that "the [Rockland] County Executive is the final policymaker with regard to personnel matters relating to County employment, which is the area in which the allegedly unconstitutional action was taken vis-a-vis [the plaintiff]." *Jean–Gilles v. Cnty. of Rockland,* 463 F.Supp.2d 437, 444 (S.D.N.Y. 2006) (*"Jean–Gilles II"*) (quoting the court's jury charge regarding municipal liability in the plaintiff's earlier case against the County).[13]

There may well be limits, however, to shielding department heads from liability on the basis of municipal policies. The Supreme Court recognized this more than twenty years ago, when it noted that

> If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.
>
> If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.

*Praprotnik,* 485 U.S. at 126, 108 S.Ct. 915. The Supreme Court acknowledged that "[i]t may not be possible to draw an elegant line that will resolve this conundrum,"

*id.,* but noted that the availability for *Monell* liability based on a widespread practice "ensures that most deliberate municipal evasions of the Constitution will be sharply limited," *id.* at 127, 108 S.Ct. 915. In other words, non-policymakers who repeatedly violate municipal policies will create grounds for *Monell* liability though the establishment of an unwritten policy or custom. This may, of course, be small comfort to victims of isolated acts of discrimination by non-policymakers. However, the Supreme Court has explained that, because *Monell's* "policymaker" status only applies to officials who have authority to make final policy, a policymaker's review and ratification of a subordinate's decision "would be chargeable to the municipality because [the policymaker's] decision is final," as the municipality has "retained the authority to measure the official's conduct for conformity with *their* policies." *Id.* Furthermore, if "an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Id.*

■ Here, Defendants contend that the EEO Policy is sufficient to strip the County Sheriff of policymaking authority over employment in the department. That policy puts the County Executive, and not the Sheriff, in the final policymaker role. Moreover, Plaintiff does not allege that the County Executive has delegated this authority to the Sheriff. Thus, this case is not unlike other cases in which a department head was not found to be a policymaker with respect to employment deci-

---

**13.** The Court notes that Plaintiff's Counsel, Mr. Sussman, also served as counsel to the plaintiff in an earlier *Jean–Gilles* case. (*See Jean–Gills v. County of Rockland, et al.,* No. 00–CV4861.) In the earlier case, Mr. Sussman did not object to the court's jury charge that "as a matter of New York State law, the

County Executive is the final policymaker with regard to personnel matters relating to county employment" in Rockland County, but rather confirmed that the court's charge "got everything right." (*See Jean–Gills v. County of Rockland, et al.,* No. 00–CV4861, July 29, 2004 Tr. 20, 31 (Weissman Decl. Ex. Z).)

sions. *See Hardy,* 2009 WL 2176117, at *4 (noting that the chief of police's appointment decisions were "subject to the approval" of the police commissioner (emphasis omitted)); *Chin,* 575 F.Supp.2d at 566 (noting that "[t]he actual 'measures and programs' that govern employment practices in [the applicable city agency] are promulgated annually" by the board of commissioners, not by the plaintiff's supervisor); *Albert,* 529 F.Supp.2d at 330–31 (finding that the police chief was not a policymaker with respect to employment because "the [d]irector of [p]ersonnel has the authority to make rules [regarding employment], the [p]ersonnel [b]oard can adopt or amend these rules, and the [c]ourt of [c]ommon [c]ouncil either approves or disapproves these rules"); *Knight,* 2006 WL 1438649, at *21 (noting that the police chief's authority over employment was constrained by the "policies established in the [p]ersonnel [r]ules and by the [c]ourt of [c]ommon [c]ouncil and the [c]ity [m]anager," and that "it is the [p]ersonnel [d]irector who, with the approval of the [p]ersonnel [b]oard, has the discretion to extend a promotional eligibility" and "who certifies to the department head names of eligible employees from the eligibility list"); *Looby,* 152 F.Supp.2d at 188 (noting that "nowhere in the [city] [c]harter is the [f]ire [c]hief given any power to create policy with respect to employment decisions" but rather only "the discretionary authority to fill vacant positions from a list of certified candidates" (internal quotation marks omitted)). Thus, Defendants' Motion could be granted on this basis alone.

Ultimately, however, the Court need not determine whether Kralik was a policymaker with respect to employment decisions in the Rockland County Sheriff's Office, as Plaintiff has acknowledged that Kralik played no role in the decision to fire Plaintiff.[14] (*See* Sept. 12, 2014 Tr. 48–49.) Thus, even if Kralik were a policymaker, the Court cannot find the County liable under *Monell's* "policymaker" exception for an alleged offence in which Kralik was not involved.[15] *See, e.g., Rosu v. City of New York,* No. 11–CV–5437, 2012 WL 6582534, at *5 (S.D.N.Y. Dec. 13, 2012) (noting that "[i]n order for an individual to be subject to Section 1983 liability in his or her official capacity, that individual must have had personal involvement in alleged constitutional deprivations is a prerequisite to an award of damages" (alterations and internal quotation marks omitted)), *aff'd,* 742 F.3d 523 (2d Cir.2014); *O'Connor,* 1998 WL 1763959, at *6 (noting that "the [s]heriff, as a policymaker for the [c]ounty, must be *personally* and directly involved in the constitutional deprivation for the municipality to be considered the 'moving force' behind the deprivation" and open the county to *Monell* liability).

At oral argument, and as noted above, Plaintiff proffered a new theory of *Monell* liability that was not explored in Plaintiff's previous submissions to the Court. Specifically, Plaintiff argued that Kralik delegated his hiring authority to the undersheriff, Guthrie, thus making him the official policymaker for the County with respect to employment policy in the Sheriff's Office

---

14. In fact, during his deposition, Plaintiff admitted that he had never spoken with Kralik, that Plaintiff had no basis to know whether Kralik had any input into the decision to terminate Plaintiff's probation, and couldn't even identify Kralik as the predecessor to the current Sheriff, Louis Falco. (*See* Baity Tr. 27, 45, 110.)

15. As Plaintiff's counsel made clear, Plaintiff is not claiming a failure to train or to supervise. (*See* Sept. 12, 2014 Tr. 58.) Therefore, the Court will not address whether decisions made by Kralik's supervisees can form a basis for *Monell* liability on behalf of the County.

and rendering Guthrie the "policymaker" for *Monell* purposes. (*See* Sept. 12, 2014 Tr. 61–64.) In other words, Plaintiff sought to invoke policymaker liability under *Monell* while acknowledging that Sheriff Kralik, the supposed final policymaker, had no role in Plaintiff's termination. To be perfectly clear, there is no evidence of any delegation in the record by Kralik of any policymaking role to Guthrie, nor has Plaintiff provided the Court with legal authority that would support this theory of policymaker-status delegation. Moreover, even if Plaintiff were alleging a policy (formal or informal) of delegating employment decisions to Guthrie or Clark, there is no evidence that the decision to delegate was racially-based, or that Kralik knew of any alleged bias by Guthrie or Clark that would influence their decision-making. To the extent that Plaintiff alleges that Kralik rubber-stamped or turned a blind eye to his subordinates' decisionmaking—allegations that have no foundation in the record here because Kralik had no role whatsoever in the decisionmaking—such actions would not be sufficient to amount to delegation of policymaking authority. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915 (noting that "[s]imply going along with discretionary decisions made by one's subordinates … is not a delegation to them of the authority to make policy" nor is "the mere failure to investigate the basis of a subordinate's discretionary" decisionmaking); *Davis v. City of New York*, 228 F.Supp.2d 327, 341 (S.D.N.Y.2002) (noting that the final policymaker must both know of the adverse action and that his or her subordinates took that action for unconstitutional reasons in order for *Monell* liability to attach), *aff'd*, 75 Fed.Appx. 827 (2d Cir.2003). Indeed, Plaintiff has not identified any evidence that Kralik was even aware of Plaintiff's termination. Moreover, Plaintiff failed to name Undersheriff Guthrie, or anyone else to whom policy-making authority could have been delegated, as a defendant in this case.

The law in the Second Circuit is clear that, "isolated acts by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Carmichael v. City of New York*, 34 F.Supp.3d 252, 263, 2014 WL 3818192, at *7 (E.D.N.Y. Aug. 1, 2014) (internal quotation marks and alteration omitted) (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir.2012)). Furthermore, Plaintiff's "delegate down" theory of *Monell* policymaker liability—especially in the absence of evidence of such policymaking delegation—would quickly eviscerate the longstanding prohibition of § 1983 liability under respondeat superior theories. *See Roe*, 542 F.3d at 36 (noting that " 'a municipality cannot be made liable' under § 1983 for acts of its employees 'by application of the doctrine of *respondeat superior*.' " (quoting *Pembaur*, 475 U.S. at 478, 106 S.Ct. 1292).) Put simply, Plaintiff puts the notion of personal responsibility, a hallmark of § 1983 liability, on its head. *See, e.g., Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir.2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show … the defendant's personal involvement in the alleged constitutional deprivation."). According to Plaintiff, the non-involvement of the sole policymaker in the adverse action morphs into a delegation of policymaking authority to others and thereby imposes *Monell* liability on a municipality. The Court will not accept Plaintiff's invitation to create such an expansive extension of *Monell* in the absence of any case law to support the viability of Plaintiff's theory.

Finally, in his post-oral argument letter to the Court, Plaintiff advanced yet anoth-

er theory of *Monell* liability which he had not previously raised in his filings. In particular, Plaintiff contends that "a cat's paw theory of liability may predicate *Monell* liability under § 1983" under the theory discussed "without expressly approving or rejecting the doctrine" by the Second Circuit in *Nagle v. Marron*, 663 F.3d 100 (2d Cir.2011). (Sept. 15, 2014 letter at 6–9.)[16] "Under this ... theory, a final decisionmaker that relies entirely on an improperly motivated recommendation from a subordinate may render the municipality liable because the subordinate, although not formally delegated the power to make decisions, acts as the municipality's agent." *Nagle*, 663 F.3d at 117 (footnote omitted).

Indeed, in his September 15, 2014 letter, Plaintiff provides no citations to evidence in the record to support this theory, nor has the Court found any evidence to support that such rubber stamping by Kralik occurred. Plaintiff also points to no evidence to support an improper motive on Guthrie's part. Thus, even if the cat's paw theory applied to § 1983 actions, Plaintiff would need to demonstrate Guthrie's dis-

criminatory motive and that Guthrie's decision was rubber stamped by Kralik.[17] The attenuated relationship between Guthrie and Kralik strains the connection required for cat's paw liability. *See Kregler v. City of New York*, 987 F.Supp.2d 357, 368–69 (S.D.N.Y.2013) (noting that, "[i]f the third-person intermediary serves as an unwitting pawn of the malevolent actor, it would render it much harder to assess the extent to which the wrongdoer's poison actually infected the decisionmaker with the requisite knowledge and discriminatory intent" and that the presence of "additional layers of attenuation" ruled out the possibility of cat's paw liability). In light of the absence of factual support for this argument, the fact that Plaintiff provides only a modicum of law on point, the absence of the Second Circuit's endorsement of the theory of liability that Plaintiff proposes, and the fact that Plaintiff waited to articulate this unique theory of *Monell* liability argument until after oral argument, the Court will not accept Plaintiff's invitation to hold the County liable under Plaintiff's embryonic argument of liability. *See United States v.*

---

**16.** Several cases in the Second Circuit since *Nagle* have considered the application of this theory to § 1983 claims, but ultimately dismissed the cases for other reasons without deciding whether cat's paw liability applies. *See Gomez v. City of New York*, No. 12–CV–6409, 2014 WL 4058700, at *5, 6 n. 8 (S.D.N.Y. Aug. 14, 2014) (finding cat's paw liability to be inapplicable because "there [was] no allegation that [individuals involved] acted as [the p]laintiff's supervisors, or as agents of the decisionmakers" but not discussing cat's paw in the context of municipal liability); *Kregler v. City of New York*, 987 F.Supp.2d 357, 367–69 (S.D.N.Y.2013) (declining to apply cat's paw liability due to the "lack of precedent in the Second Circuit applying the cat's paw theory of liability to the context of a § 1983 action, and the gulf between the facts in this case and the facts in a typical cat's paw case for employer liability," where there was an attenuated relationship between the decisionmaker and the bad actor

and where the facts did not support animus that could be traced along the agency relationship); *Monz v. Rocky Point Fire Dist.*, 853 F.Supp.2d 277, 288 n. 13 (E.D.N.Y.2012) (declining to extend cat's paw liability in a § 1983 action as "the Second Circuit has yet to determine whether this ... is applicable in the context of § 1983 actions and the Court will not do so here," where the plaintiff "did not explicitly argue this theory of liability," and where "no facts were introduced to establish" the impermissible motive of the defendants whose motivation could be attributed to the employer under the cat's paw theory (internal citation omitted)), *aff'd*, 519 Fed.Appx. 724 (2d Cir.2013).

**17.** Again, there is no evidence in the record to support this contention, nor does Plaintiff articulate this chain of authority in his submissions to the Court or provide citations to the record that would support such an argument.

*Barnes,* 158 F.3d 662, 672 (2d Cir.1998) ("Normally, we will not consider arguments raised for the first time in a reply brief, let alone at or after oral argument." (alterations and internal quotation marks omitted)); *Harris v. Wu–Tang Prods., Inc.,* No. 05–CV–3157, 2006 WL 1677127, at *3 (S.D.N.Y. June 16, 2006) ("This Court need not consider an argument raised for the first time at oral argument."); *Process Res. Corp. v. Delta Air Lines, Inc.,* No. 98–CV–5648, 2000 WL 145114, at *7 (S.D.N.Y. Feb. 3, 2000) ("The fact that the argument of estoppel was raised for the first time at oral argument would be reason enough to dismiss it."). Therefore, the claims against the County of Rockland and Kralik in his official capacity are dismissed.

### 3. McDonnell Douglas

Even if Plaintiff were able to establish that a claim could be brought against the County, Plaintiff has not identified a material fact in dispute, nor evidence to permit a reasonable juror to find that Plaintiff has satisfied the requirements of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for a claim of discrimination. "Courts employ the [*McDonnell Douglas*] burden-shifting analysis when evaluating disparate treatment claims brought under § 1983 and § 1981." *Johnson v. N.Y.C. Dep't of Educ.,* 39 F.Supp.3d 314, 321, 2014 WL 4090844, at *6 (E.D.N.Y. Aug. 19, 2014) (citing *Garcia v. Hartford Police Dep't,* 706 F.3d 120, 127 (2d Cir.2013)). First, Plaintiff must establish a prima facie case of discrimination, *see McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, by demonstrating: "(1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the

protected class." *Ricci v. DeStefano,* 530 F.3d 88, 110 (2d Cir.2008). "Although the burden of establishing a prima facie case is not onerous, and has been frequently described as minimal, the Second Circuit has also noted that a jury cannot infer discrimination from thin air." *Stafford v. N.Y. Presbyterian Hosp.,* No. 06–CV2150, 2011 WL 1131104, at *5 (E.D.N.Y. Mar. 28, 2011) (citations and emphasis omitted) (citing *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997) and *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998)).

If a plaintiff establishes a prima facie case of discrimination, the burden "then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *accord Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citations and internal quotation marks omitted). Once the employer satisfies this burden, "the presumption of discrimination drops out of the picture," and the plaintiff bears the burden of demonstrating "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 143, 120 S.Ct. 2097 (citations and internal quotation marks omitted). Even drawing all inferences in Plaintiff's favor, the Court cannot find that the evidence in Plaintiff's case could support a reasonable jury to return a verdict in Plaintiff's favor.

#### a. Prima Facie Case

Plaintiff's claims cannot survive even the first step of the *McDonnell Douglas* analysis. While Plaintiff is a member of a

protected class on the basis of his race, and while Defendants do not challenge his qualification for the position he held, nor that Plaintiff suffered an adverse employment action when he was terminated and not promoted to permanent corrections officer, Defendants rightly suggest that Plaintiff "cannot establish that his termination took place under circumstances giving rise to an inference of discrimination." (Defs.' Mem. 9.)

▮▮▮▮▮ Absent direct evidence demonstrating discriminatory intent, which Plaintiff has not alleged and no evidence has suggested, "[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees [not in the protected class] were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999). "To be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare [him]self must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997). And to be similarly situated in "all material respects," Plaintiff must "show that similarly situated employees who went undisciplined engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir.2000); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir.2001) ("[W]here a plaintiff seeks to establish [his] minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."); *Jackson v. City of New York*, 29 F.Supp.3d 161, 172–73, 2014 WL 1010785, at *6

(E.D.N.Y. Mar. 17, 2014) (holding that the plaintiff "fail[ed] to identify any similarly situated employees who were not comparably disciplined for substantially the same conduct that [the] [p]laintiff engaged in, or was accused of engaging in"); *McLaughlin v. New York*, No. 11–CV1242, 2013 WL 3915183, at *7 (S.D.N.Y. July 30, 2013) (applying *Graham*, 230 F.3d at 40). The conduct need not be "identical," but there must be a "reasonably close resemblance of the facts and circumstances of [the] plaintiff's and [the] comparator's cases," such that "the conduct for which the employer imposed discipline was of comparable seriousness" to the conduct of the similarly situated but undisciplined employees. *Graham*, 230 F.3d at 40; *see also Kugler v. Donahoe*, No. 11–CV–648, 2014 WL 1010317, at *10 (E.D.N.Y. Mar. 17, 2014) (applying *Graham* and noting that "[t]he employees' situations need not be identical, but must closely resemble each other"); *Taylor v. Seamen's Soc'y for Children*, No. 12–CV–3713, 2013 WL 6633166, at *14 (S.D.N.Y. Dec. 17, 2013) ("What constitutes 'all material respects' varies, of course, from case to case, but 'the plaintiff and those [he] maintains were similarly situated [must have been] subject to the same workplace standards[,]' . . . . [which] requires 'a reasonably close resemblance of facts and circumstances.' " (second alteration in original) (quoting *Graham*, 230 F.3d at 40)).

▮▮▮ Plaintiff argues that such an inference can be drawn from the fact that terminations of employment "are extremely rare and have been taken against white people only where they were arrested for serious criminal activity, i.e., selling drugs or guns to inmates, or due to severe attendance problems."[18] (Pl.'s Mem. 14–15.)

---

18. Here, too, Plaintiff's aversion to citations renders Plaintiff's claim about drug and gun sales to inmates incredibly difficult to evalu-

ate. The Court finds no reference in the record to individuals terminated for such activity; the only instances similar to those

Furthermore, in Plaintiff's Complaint, and in his deposition, Plaintiff drew comparisons between himself and Caucasian corrections officers who were working at the same time as Plaintiff. (*See* Compl. ¶ 17 (claiming that "[d]uring the last several years, [D]efendants have made permanent Caucasian corrections officers who worked in the same job as [P]laintiff despite worse employment records than [P]laintiff's"); Baity Tr. ¶¶ 112–114, 116.) However, the officers that Plaintiff has identified as comparators—officers Helchowski, Dillon, Heller, Enright, and "Dan"—have circumstances that are distinguishable from Plaintiff's in multiple respects. For example, there is no evidence of any behavioral problems with Heller, Enright, or "Dan," and neither Plaintiff nor Conjura could identify any problems with these three officers during their probationary terms. (*Id.* 112; Conjura Tr. 114–15.) [19] In contrast, Plaintiff was involved in an incident with an inmate that resulted in a suit being filed against the County, (*see* Weissman Decl. Ex. L, at 7), and had two incidents that his supervisors memorialized in memoranda that referenced Plaintiff's "less than desirable" attitude, (Mueller Mem. 1), and noted that these incidents were "of concern" given Plaintiff's ongoing probationary status, (King Mem. 2). Given these differences, the Court cannot find that a reasonable jury would find these three officers to be "similarly situated in

all material respects" as to serve as to permit an inference of discrimination.

Similarly, Plaintiff has identified no behavioral or performance issues with Helchowski, nor his involvement in any incidents with inmates, let alone ones that resulted in litigation. Plaintiff admitted no knowledge of anything Helchowski "did that is similar to" the Gowins incident and the incidents memorialized in the Muller and King memoranda. (*See* Baity Tr. 113.) Plaintiff claimed that Helchowski was too often absent during his probationary period, (*see id.* at 112), however Helchowski's absences did not exceed his allotment of sick, personal, and vacation days, (Liska Decl. ¶ 36.) In fact, the record suggests that there were no complaints about Helchowski during his probationary period. (*See* Clark Tr. 59.) Therefore, as with the other officers mentioned above, the Court cannot find that Helchowski is sufficiently similar to serve as a comparator to Plaintiff and provide a basis for any reasonable jury to find an inference of discrimination.

Any attempt by Plaintiff to draw parallels between his case and that of officer Dillon is also unavailing. In a single incident outside of work, Dillon was arrested on drug possession charges, but these charges were later dismissed and only a seat belt violation remained on Dillon's record. (*See* Liska Decl. ¶ 10, 18, 24; Cert. of Dismissal in *New York v. Dillon,*

---

Plaintiff references are those involving one African–American corrections officer who was terminated for "corresponding with the female inmates he was supposed to be supervising," two Caucasian officers who were terminated "due to attendance problems," another Caucasian officer "whose probation [was] terminated ... because of his failure to follow security procedures," and a fourth Caucasian officer "whose probation [was] terminated ... because he was videotaped purchasing illegal drugs." (Defs.' 56.1 ¶¶ 202–03; Liska Decl. ¶¶ 2–3.)

**19.** Furthermore, at oral argument, Plaintiff insinuated that Plaintiff was evaluated more frequently than other officers. (*See* Sept. 12, 2014 Tr. 40.) This assertion is contradicted by the record, which suggests that Plaintiff received a comparable number of evaluations as officers Enright and Heller. (*Compare* Baity Aff. Ex. 1 (Baity performance reviews), *with* Sussman Ex. 6 (Enright and Heller performance reviews). *See* Sept. 12, 2014 Tr. 53.)

at 1.) In contrast, Plaintiff admits that the Gowins incident and the incidents involving O'Sullivan and Ludwig occurred. (*See* Baity Tr. 62–63, 96–98, 101–103.) In addition, the repercussions of the Gowins incident are ongoing due to the suit filed by Gowins against the County. (*See* Defs.' 56.1 ¶ 63; Pl.'s Resp. ¶ 63.) Despite the serious allegations involved in the charges filed against Dillon, his single out-of-work arrest for charges that were ultimately dropped is not comparable to the multiple workplace incidents involving Plaintiff, two of which led to his supervisors expressing concern about his job performance and the other of which resulted in injury to an inmate and a suit against the County. Furthermore, Plaintiff's incidents involve his interactions with co-workers and inmates, which bear directly upon his job performance, as compared to the dropped charges against Dillon.

Furthermore, to the extent that Plaintiff alleges that his record was considered less favorably than Dillon's during the determination of whether to promote each officer to permanent status or terminate their employment, different decisionmakers were involved. With respect to Plaintiff, the decision was made by Clark in consultation with Conjura and Gutherie and drawing upon information from Liska. (*See* Clark Tr. 36–38, 43–45, 55–57; Conjura Tr. 55–58.) The employment decision with respect to Dillon was made by McDonald, after consulting with Liska. (*See* McDonald Decl. ¶ 5; Liska Decl. ¶ 34.) Neither Clark, Conjura, nor Gutherie played a role in the employment decision regarding Dillon. (McDonald Decl. ¶¶ 8–10.) This difference is significant enough to prevent a reasonable jury from finding that Dillon and Plaintiff were similarly situated so as to allow the drawing of an inference of discrimination from the fact that Dillon was promoted while Plaintiff was dismissed. *See White v. Conn., Dep't*

*of Corr.*, No. 08–CV–1168, 2010 WL 3447505, at *6 (D.Conn. Aug. 24, 2010) ("To be considered similarly situated, an individual must have been treated more favorably by the same decisionmaker that dealt with the plaintiff."); *Jeunes v. Potter*, No. 08–CV–1218, 2009 WL 2883060, at *11 (D.Conn. Sept. 3, 2009) (same); *Syrkin v. State Univ. of N.Y.*, No. 04–CV–4336, 2008 WL 4179690, at *7 (E.D.N.Y. Sept. 10, 2008) (noting that "when different decisionmakers are involved, two decisions are rarely similarly situated in all relevant respects" (internal quotation marks omitted)), *aff'd*, 370 Fed.Appx. 150 (2d Cir. 2010). "This is so because different decisionmakers may rely on different factors when deciding whether, or how severely, to discipline an employee." *White*, 2010 WL 3447505, at *6; *see also Smith v. Xerox Corp.*, 196 F.3d 358, 370–71 (2d Cir.1999) ("Because intent is the critical issue [in disparate treatment cases], only a comparison between persons evaluated by the same decision-maker is probative of discrimination."), *overruled on alternate grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir.2006), *vacated* 554 U.S. 84, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008). In addition to different decisionmakers, the different staff involved in Plaintiff's and Dillon's case may suggest that they had different supervisors, which could provide further basis to find them not similarly situated. *See McDowell v. T–Mobile USA, Inc.*, No. 04–CV–2909, 2007 WL 2816194 at *9 (E.D.N.Y. Sept. 26, 2007) ("In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated." (internal quotation marks omitted)); *Woods*, 473 F.Supp.2d at 525 n. 38 (noting that the

comparators "had different supervisors than plaintiff, which has been recognized as a factor militating against finding individuals similarly situated"); *Downes v. Potter*, No. 04–CV–3876, 2006 WL 2092479 at *11 n. 4 (E.D.N.Y. July 26, 2006). ("Although the existence of different supervisors is not necessarily dispositive under the Second Circuit case law in determining whether two employees are similarly situated, it is obviously a very important factor.").

Lastly, the fact that Dillon was Clark's nephew may have, consciously or unconsciously, led to generous decision-making with respect to Dillon's employment. However "[a]s much as nepotism may smack of unfairness, it is not discrimination" and does not provide grounds for an employment discrimination claim. *Albuja v. Nat'l Broadcasting Co. Universal, Inc.*, 851 F.Supp.2d 599, 612 n. 7 (S.D.N.Y. 2012) (internal quotation marks omitted); *Martin v. Queens Cnty. Civil Court*, No. 07–CV–1485, 2009 WL 3497489, at *16 (E.D.N.Y. Oct. 28, 2009) (same). For all of the aforementioned reasons, the Court does not find that Plaintiff has identified any similarly-situated employees whose cases may provide grounds for a reasonable jury to infer a prima facie case of discrimination.

The fact that Liska played a role in both hiring Plaintiff and ultimately recommending that he be fired further cuts against any inference of discrimination related to Plaintiff's termination. (*See* Liska Decl. ¶ 4, 7, 8; Clark Tr. 38; Conjura Tr. 57.) "[W]hen the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *Gue v. Suleiman*, No. 10–CV–8958, 2012 WL 4473283, at *5 (S.D.N.Y. Sept. 27, 2012) (citations and

internal quotation marks omitted) (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir.2000)), *appeal dismissed*, No. 13–CV–112 (2d Cir. Apr. 25, 2013). "The decision-makers in the hiring and firing need not mirror each other exactly as long as one management-level employee played a substantial role in both decisions." *Campbell v. Alliance Nat'l Inc.*, 107 F.Supp.2d 234, 250 (S.D.N.Y.2000); *see Ralkin v. N.Y.C. Transit Auth.*, 62 F.Supp.2d 989, 1000 (E.D.N.Y.1999) (holding that the same actor inference applied where a manager, who may not have actually hired employee-plaintiff, interviewed plaintiff and made the recommendation to hire her and played a significant role in the decision to fire her). Even if the "same actor" inference is not applicable here, given Liska's minor role in Plaintiff's termination, it nonetheless counters any inference that Liska's reporting about the O'Sullivan and Ludwig incidents was motivated to result in Plaintiff's termination.

Plaintiff stresses that his performance evaluations demonstrate that he "was a fine officer, who showed ample respect for colleagues and superiors alike and was well respected by his peers." (Pl.'s Mem. 18.) Yet the reviews provided to the Court only date through September 2009—before the incidents with O'Sullivan and Ludwig. (*See* Baity Aff. Ex. 1.) Moreover, a series of positive performance reviews that predate the incidents in question does not rule out the possibility that Plaintiff's performance may have changed during the months leading up to his termination. For all of these reasons, the Court finds that Plaintiff has not demonstrated a prima facie case that his termination was the result of discrimination.

*b. Remaining McDonnell Douglas steps*

If Plaintiff were able to demonstrate a prima facie case of discrimination, his claim would nonetheless fail to survive

the remaining part of the *McDonnell Douglas* analysis. As discussed above, if Plaintiff makes out a prima facie case, the burden would then "shift to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 (citations and internal quotation marks omitted). In essence, Defendants need to "articulate a legitimate nondiscriminatory reason for its employment decision." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir.1995). Defendants have done so here, citing the Gowins incident, "which resulted in an inmate sustaining a fractured orbital and [spurred] various accusations against the Correctional Facility," along with Plaintiff's incidents with O'Sullivan and Ludwig, and the memoranda from King and Mueller regarding these incidents, all of which raised serious concerns about Plaintiff's behavior and respect for the chain-of-command. (*See* Defs.'s Mem. 13–14, 20–21.) Specifically, Conjura "was concerned that [P]laintiff had displayed a pattern of behavior that would be difficult to correct once [Plaintiff] became permanent and recommended that [P]laintiff's probation be terminated." (*Id.* at 21; *see also* Conjura Tr. 87–89); *see also Williams v. Mount Sinai Med. Ctr.*, 859 F.Supp.2d 625, 641 (S.D.N.Y.2012) (holding that the defendant had "met its burden at the second *McDonnell Douglas* stage of articulating a legitimate, non-discriminatory reason for terminating" the plaintiff where the plaintiff was disciplined for "five patient complaints but dispute[d] some of the underlying conduct that resulted in the patient complaints"); *Buchanan v. Hilton Garden Inn Westbury*, No. 06–CV–3085, 2008 WL 858986, at *10 (E.D.N.Y. Mar. 31, 2008) (noting that, because the "defendant has produced evidence that [the] plaintiff was terminated because of his repeated disciplinary issues," plaintiff's prima facie case of discrimination was rebutted).

If a defendant articulates a non-discriminatory reason, as Defendants have here, the presumption of discrimination drops out of the picture, and the plaintiff must show that the adverse employment decision more likely than not was motivated in whole or part by discriminatory reasons. *See, e.g., Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 (noting that, if the defendant can articulate a nondiscriminatory basis for the employment action, the burden returns to the plaintiff to show "by a preponderance of the evidence" that the defendant's "proffered reason" for the adverse employment action was false); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (in the same instance, explaining that the plaintiff must show that, "more likely than not[,] [discrimination] was the real reason" for the employment action (second alteration in original)). "Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (alteration in original) (citation and internal quotation marks omitted). The "Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Olorode v. Streamingedge, Inc.*, No. 11–CV–6934, 2014 WL 1689039, at *12 (S.D.N.Y. Apr. 29, 2014) (emphasis and

internal quotation marks omitted), *adopted by* 2014 WL 3974581 (S.D.N.Y. Aug. 13, 2014). "In seeking to show that there is a genuine issue of material fact for trial, the nonmoving party cannot rely on mere allegations, denials, conjectures[,] or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial." *Price v. Cushman & Wakefield, Inc.,* 808 F.Supp.2d 670, 685 (S.D.N.Y.2011); *see also Young v. Ltd. Brands,* No. 11–CV–2927, 2013 WL 5434149, at *4 (S.D.N.Y. Sept. 25, 2013) (noting that a "party may not rely on mere speculation or conjecture as to the true·nature of the facts to overcome a motion for summary judgment, because mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." (alterations and internal quotation marks omitted) (citing *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010))).

 Here, too, Plaintiff cannot meet his burden, as the record cannot support a finding that Defendants' termination of Plaintiff was pretextual. Plaintiff concedes that the events that form the basis of Defendants' justification for termination occurred, though he disputes some of the particulars of the events, specifically the behavior of the other individuals involved: Gowins, O'Sullivan, and Ludwig. None of these factual disputes is material, however, because none suggests that the interpretation of the Gowins incident, or the Mueller and Clark memoranda that support Plaintiff's termination were motivated by bias. As a preliminary matter, "an employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent." *Mattera v. JPMorgan Chase Corp.,* 740 F.Supp.2d 561, 576 (S.D.N.Y.2010) (internal quotation marks omitted). Moreover, even if the

incidents involving Plaintiff and Gowins, O'Sullivan, and Ludwig occurred as Plaintiff suggests, "[t]he question is not whether defendant's decision to fire plaintiff was correct, but whether it was discriminatory." *Jagmohan v. Long Island R.R. Co.,* No. 12–CV–3146, 2014 WL 4417745, at *11 (E.D.N.Y. Sept. 8, 2014); *see also Oluyomi v. Napolitano,* 811 F.Supp.2d 926, 947–48 (S.D.N.Y.2011) (noting that "any dispute as to what actually transpired [in an incident leading to the plaintiff's suspension], is not 'material' to the question of whether [the defendant's] reasons for its actions against" the plaintiff was discriminatory, as "[t]he issue to be proven in a discrimination case is whether there was an improper motive for the employment decision—not whether any conduct relied upon by the employer actually occurred"), *aff'd,* 481 Fed.Appx. 693 (2d Cir.2012); *Kolesnikow v. Hudson Valley Hosp. Ctr.,* 622 F.Supp.2d 98, 111 (S.D.N.Y.2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the employer reached a correct conclusion in attributing fault [to the plaintiff] …, but whether the employer made a good-faith business determination.'" (alterations in original) (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff,* No. 07–CV–8835, 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008))).

The absence of adequate comparators, as discussed above, makes it even more difficult for Plaintiff to demonstrate that he would have been treated differently if he had been a different race. Furthermore, there is no evidence of racial motivation in the record, apart from a few vague hearsay allegations that Plaintiff had been told that Clark "used the N word frequently," though Plaintiff never heard Clark "say anything racially derogatory." (Sussman Aff. Ex. 4 (Excerpted Tr. of Dep. of Pl. W. Terrell Baity ("Sussman Baity Tr.")) 34; Baity Tr. 45.) Plaintiff claims to

have heard Conjura tell a joke "about two jews [who] entered the bar," but testified that he never heard anything "directed at [Plaintiff] per se." (Sussman Baity Tr. at 34.) Lastly, Plaintiff claims that "other black corrections officers" told him that Liska and King made racially derogatory remarks, but that he had not heard such remarks personally. (*See id.* at 35–36.) Plaintiff's testimony, even if believed, is inadmissible hearsay, and in the absence of any corroborating testimony is simply insufficient to form a basis to conclude that Plaintiff's termination was racially-motivated. *See Taylor v. Potter*, No. 99–CV–4941, 2004 WL 1811423, at *16–19 (S.D.N.Y. Aug. 16, 2004) (rejecting the plaintiff's claim that the defendant was racist where the only evidence provided by the plaintiff was the plaintiff's own inadmissable hearsay testimony about racist comments others witnessed), *aff'd*, 148 Fed.Appx. 33 (2d Cir.2005). Upon consideration of all the evidence presented to the Court, and drawing all inferences in favor of the Plaintiff, the Court nonetheless finds that there is insufficient evidence for a reasonable jury to find Plaintiff to have carried his burden here. Accordingly, if Plaintiff could successfully argue that the County was liable under *Monell*, and if Plaintiff could further survive the requirements of the first step of *McDonnell Douglas*, Plaintiffs claim would nonetheless fail at the third step of the *McDonnell Douglas* test, because the record cannot reasonably support Plaintiffs argument that Defendants' justification for his termination was pretextual.

### III. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is granted. In addition, the Court dismisses the Complaint with respect to James F. Kralik in his individual capacity. The Clerk of the Court is respectfully request-

ed to terminate the pending motion, (*see* Dkt. No. 26), enter judgment for Defendants, and close the case.

SO ORDERED.